MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By:  LI YU
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel:  (212) 637-2734
Fax: (212) 637-2686
Email: li.yu@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

ROGER STEVEN CARDENAS, an infant, by his   :
Mother and Natural Guardian, EUDOCIA       :
ANGUISACA, and EUDOCIA ANGUISACA,    :
individually,                              :   ECF CASE
                                          :

     Plaintiffs,                         :
                                          :

       - against -                :   07 Civ. 11145 (KMK)(GAY)
                                          :

PHELPS MEMORIAL HOSPITAL CENTER,     :
                                          :

     Defendant.                       :

------------------------------------------------------------------ x   **ANSWER OF THIRD-PARTY**

PHELPS MEMORIAL HOSPITAL CENTER,     :   **DEFENDANTS OPEN DOOR**
                                          :   **FAMILY MEDICAL CENTER,**

    Third-Party Plaintiff,         :   **INC. AND OSSINING OPEN**
                                          :   **DOOR TO THIRD-PARTY**

      - against -              :   **COMPLAINT OF PHELPS**
                                          :   **MEMORIAL HOSPITAL**

OPEN DOOR FAMILY MEDICAL CENTER, INC.   :   **CENTER**
and OSSINING OPEN DOOR,              :
                                          :

    Third-Party Defendants.         :
                                          :

------------------------------------------------------------------ x

       Third-party defendant Open Door Family Medical Center, Inc. and its office in

Ossining, New York, third-party defendant Ossining Open Door, (collectively, "Open

Door"), by and through their attorney, Michael J. Garcia, United States Attorney for the

Southern District of New York, answer the Third-Party Complaint (the "Phelps Third-Party

Complaint") filed against Open Door by Phelps Memorial Hospital Center ("Phelps") in the above-referenced action on information and belief as follows:

1.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Phelps Third-Party Complaint, except admit that Phelps is a hospital located at 701 North Broadway in Sleepy Hollow, New York.

2.      Admit the allegations in paragraph 2 of the Phelps Third-Party Complaint.

3.      Deny allegations in paragraph 3 of the Phelps Third-Party Complaint, except admit that one of the Open Door locations is at 165 Main Street, Ossining, New York 10562.

4.      Admit the allegations in paragraph 4 of the Phelps Third-Party Complaint.

5.      Paragraph 5 of the Phelps Third-Party Complaint consists of Phelps's characterizations of the terms of an agreement between Open Door and Phelps dated September 1, 2003 (the "September 2003 Phelps-Open Door Agreement") to which no response is required; Open Door respectfully refers the Court to the actual terms of that agreement, a copy of which is attached as Exhibit A to this answer.  To the extent that a response is required, Open Door deny the allegations in paragraph 5, except admit that Open Door and Phelps had a contract pursuant to which pre-natal care was provided to certain patients in the third trimester of their pregnancy by Open Door employees at Phelps.

6.      Deny the allegations in paragraph 6 of the Phelps Third-Party Complaint, except admit that certain of the patients who received pre-natal care at Open Door during the first two trimesters of their pregnancy pursuant to the September 2003 Phelps-Open Door Agreement were advised that delivery of their infants would be performed at Phelps.

7.      Deny the allegations in paragraph 7 of the Phelps Third-Party Complaint, except admit that Open Door has employed licensed nurse-midwives and that Open Door employees have cared for patients undergoing labor and delivery.

8.      Admit the allegations in paragraph 8 of the Phelps Third-Party Complaint.

9.      Deny the allegations in paragraph 9 of the Phelps Third-Party Complaint, except admit that plaintiff Eudocia Anguisaca ("Anguisaca") was a patient at Open Door in December 2004 and received pre-natal care at that time.

10.     Deny the allegations in paragraph 10 of the Phelps Third-Party Complaint, except admit that Anguisaca received pre-natal care at Open Door from on or about December 2004 until on or about May 2005.

11.     Deny the allegations in paragraph 11 of the Phelps Third-Party Complaint.

12.     Admit the allegations in paragraph 12 of the Phelps Third-Party Complaint.

13.     Deny the allegations in paragraph 11 of the Phelps Third-Party Complaint, except admit that, on August 10, 2005, nurse-midwife Patricia Mahoney was present during the delivery of plaintiff Roger Stevens Cardenas ("Cardenas") and assisted in the delivery of Cardenas.

14.     Admit the allegations in paragraph 14 of the Phelps Third-Party Complaint.

15.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Phelps Third-Party Complaint as to the manner of service upon Phelps; the remaining allegations in paragraph 15 consist of Phelps's characterization of statements in various filings to which no response is required.

16.     Deny the allegations in paragraph 16 in the Phelps Third-Party Complaint, except admit that, on or about August 10, 2005, Patricia Mahoney assisted in the delivery of Cardenas.

17.     Paragraph 17 of the Phelps Third-Party Complaint consists solely of conclusions of law to which no response is required; to the extent that a response is required, deny the allegations in paragraph 17.

The paragraph following "WHEREFORE, the defendant/third-party plaintiff, PHELPS MEMORIAL HOSPITAL CENTER, demands judgment against the third-party defendants" consists solely of Phelps's request for relief to which no response is required. To the extent that a response is required, the Government deny that Phelps is entitled to any of the relief sought.

## FIRST DEFENSE

The Phelps Third-Party Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

Neither Open Door nor any of its employees or agents was negligent, at fault or acted with want of due care in regard to the events alleged in the Phelps Third-Party Complaint.

## THIRD DEFENSE

The injuries and damages alleged in the Phelps Third-Party Complaint were not proximately caused by a negligent or wrongful act or omission of any of Open Door's employees or agents.

## FOURTH DEFENSE

Any injuries or damages alleged in the Phelps Third-Party Complaint were caused in whole or in part to the negligence or other acts of third parties over whom Open Door exercised no control, and any recovery must be proportionately reduced.

## FIFTH DEFENSE

Phelps's recovery, if any, is limited by the New York statute governing a claim for contribution, N.Y. CPLR § 1402.

## SIXTH DEFENSE

Phelps's recovery, if any, is limited by provisions of the Federal Tort Claims Act.

*See* 28 U.S.C. § 2679.

## SEVENTH DEFENSE

The Federal Tort Claims Act bars the award of attorney's fees for claims asserted in

the Phelps Third-Party Complaint.  *See* 28 U.S.C. § 2412.

## EIGHTH DEFENSE

Open Door asserts that it has, or may have, additional affirmative defenses that are

not known to defendant at this time, but which may be ascertained through discovery. Open

Door specifically preserves these and other defenses as they are ascertained through the

course of discovery.

WHEREFORE, Open Door demands judgment dismissing the Phelps Third-Party

Complaint and granting such further relief as this Court deems proper, including costs and

disbursements.

Dated: New York, New York
       January 28, 2008
       MICHAEL J. GARCIA
       United States Attorney
       Attorney for Open Door

By:    s/ Li Yu_____
        LI  YU
       Assistant United States Attorney
       Tel.: (212) 637-2734
       Fax: (212) 637-2686
       Email:  li.yu@usdoj.gov

TO:    James P. Fitzgerald, Esq.
       Fitzgerald & Fitzgerald, P.C.
       538 Riverdale Ave.
       Yonkers, NY 10705
       *Counsel for Plaintiffs*

       Rocco Conte, Esq.
       O'Connor, McGuinness, Conte, Doyle & Oleson

One Barker Avenue, Suite 675
White Plains, NY 10601-1517
*Counsel for Defendant and Third-Party Plaintiff Phelps Memorial Hospital Center*

CERTIFICATE OF SERVICE

I, Li Yu, an Assistant United States Attorney for the Southern District of New York, hereby certify that on January 28, 2008, I caused a copy of the Answer of Third-Party Defendants Open Door Family Medical Center, Inc. and Ossining Open Door to the Third-Party Complaint of Phelps Memorial Hospital Center in *Cardenas, et al. v. Phelps Memorial Hospital Center*, 07 Civ. 11145 (KMK)(GAY), to be served, by First-Class Mail and electronic mail, upon counsel:

James P. Fitzgerald, Esq.
Fitzgerald & Fitzgerald, P.C.
538 Riverdale Ave.
Yonkers, NY 10705
*Counsel for Plaintiffs*

Rocco Conte, Esq.
O'Connor, McGuinness, Conte, Doyle & Oleson
One Barker Avenue, Suite 675
White Plains, NY 10601-1517
*Counsel for Defendant and Third-Party Plaintiff Phelps Memorial Hospital Center*

Dated:  New York, New York
        January 28, 2008

By: s/ Li Yu_____
    LI  YU
    Assistant United States Attorney

*April 2. 2004*
*CW, MM, SW + Agreement*
*Circled*

*Cherly Denniel*

AGREEMENT

OPEN DOOR FAMILY MEDICAL CENTER, INC.

And

PHELPS MEMORIAL HOSPITAL CENTER

AGREEMENT

AGREEMENT made as of September 1, 2003, between Ossining Open Door Family Medical Center, Inc., a not-for-profit corporation having an address at 165 Main Street, Ossining, New York ("Open Door"), Phelps Memorial Hospital Center a not-for-profit corporation having an address at 701 North Broadway, Sleepy Hollow, New York ("Phelps").

I.    Recitals:  The following recitals are incorporated into this Agreement:

A.    Phelps owns and operates a not-for-profit hospital at 701 North Broadway, Sleepy Hollow, New York.

B.    Open Door owns and operates a non-profit Community Health Center at 165 Main St. in Ossining, New York with additional sites in Sleepy Hollow, New York and Port Chester, New York; all references herein to Open Door shall refer to Open Door's Ossining, Port Chester, and Sleepy Hollow locations.

C.    The parties wish to establish a coordinated delivery system to ensure provider continuity in prenatal care, delivery, and post-natal care in the service areas served by Phelps and Open Door.  Further, the parties agree that certain economies of scale may be achieved, if certain aspects of the pre-natal programs run by both Phelps and Open Door are coordinated to provide certain continuity to patients.

D.    The parties have agreed upon a structure whereby patients seeking pre-natal, delivery, and post-natal services through either Phelps' pre-natal clinic and/or Open Door locations (hereafter "Patients"; the term Patients as used herein shall only include those individuals seeking pre-natal, delivery and postnatal services through either Phelps' pre-natal clinic and/or Open Door, and no other patients) will receive pre-natal care according to an Ossining or Port Chester ambulatory care model. Ossining and Sleepy Hollow patients will receive their ambulatory care through the second trimester of pregnancy at Open Door, and late-term pre-natal care (following the third trimester risk assessment), consisting of approximately the last 4.5 prenatal visits, as well as delivery at Phelps, and then return to Open Door for post-natal care. Port Chester patients will receive all of their ambulatory care at Open Door.  Physician and midwife services in the specialty of Obstetrics and Gynecology will be provided through personnel engaged by Open Door at both the Phelps' clinic and Ossining Open Door and Open Door Port Chester/Rye Brook in an effort to provide continuity of care to the Patients.

II.    Patient Services

Ossining patients contacting either the Phelps' clinic or Ossining & Sleepy Hollow Open Door for pre-natal care during the initial two trimesters of pregnancy shall be seen at Open Door.  Ossining & Sleepy Hollow Patients seen at Open Door during all or any part of their initial two trimesters of pregnancy as well as Patients contacting either the Phelps' clinic or Open Door for pre-natal or delivery services during the third trimester of their pregnancy shall be seen at Phelps. Patients from Port Chester/Rye Brook shall

2

receive all of their ambulatory care at Open Door. All Patient deliveries will be performed at Phelps. Notwithstanding any of the provisions of this Agreement, Providers shall not refer a Patient to either Open Door or Phelps in accordance with the terms hereof if (i) the Patient expressly requests to receive health care services from another health care provider or (ii) the Provider determines, in his or her professional judgment, that referral to another health care provider is necessary to meet the Patient's medical needs.

A.      Open Door will provide outpatient case management and support services to all Patients at Open Door, including all of the prenatal services mandated under the State Medicaid program referred to as "P-CAP," without exception to all enrollees in the Medicaid program requesting such services. Open Door will also provide post-partum and pediatrics (and maternal post-natal) services to such Patients upon a Patient's request.

B.      Phelps will provide outpatient, case management, and support services to all Patients seen at Phelps, including all of the prenatal services mandated under the P-CAP program, without exception to all enrollees in the Medicaid program requesting such services. The care of Ossining and Sleepy Hollow patients seen at Open Door shall be transferred to the Phelps' clinic once the third trimester risk assessment has been completed at Open Door (or at a otherwise mutually agreed upon time, based upon the needs of the particular Patient). Phelps will also provide all delivery and in-patient services for the Patients and their infants, including newborn assessments. Services to high-risk Patients shall be provided in accordance with Phelps' existing protocols, where appropriate, high-risk Patients will be transferred to appropriate facilities.

C.      Open Door shall cause its physicians (each a "Physician") and midwives (each a "Midwife") to provide prenatal services at Ossining Open Door, Port Chester/Rye Brook Open Door and the Phelps' clinic (the Physicians and Midwives are collectively referred to herein as "Providers"). All deliveries and hospital based gynecology procedures will be performed at Phelps by Open Door providers unless patients are considered to be high risk or the patient requests a different location. Outpatient gynecology services will also be provided by Open Door [Providers/Physicians] at Open Door.

III.    Services at Open Door

A.      Patient Care Services. "Subject to any limitations set forth in this Agreement, Open Door shall cause the Providers it employs or otherwise retains to provide Patient care services at either Open Door or Phelps in accordance with the terms of Section II hereof." Open Door shall, and shall cause each individual Provider to, provide such services in accordance with the terms of this Agreement. All deliveries performed in connection with Patients seen at Phelps and/or Open Door shall be performed at Phelps, except as set forth under Section II. above. Open Door and Phelps shall provide or arrange for the provision of non-emergent ultrasound services to Patients covered hereunder as described in Schedule C.

Open Door shall provide 24 X 7 (i) Midwife coverage to Phelps labor and delivery suite, and (ii) on-call Physician back-up coverage for the Midwives. The Midwives shall also be available to cover non-Open Door hospitalized patients if necessary.

B.  <u>Hours</u>.  During the term of this Agreement, Open Door shall cause its Providers to provide such services as are necessary to fulfill its duties as set forth herein, as directed by Phelps from time to time.  Open Door shall provide (i) administrative and supervisory services (as required herein) at Phelps and Open Door during normal working hours as requested by Phelps, and (ii) Provider services, in the specialty of Obstetrics and Gynecology, to Patients at Phelps and Open Door in accordance with this Agreement.  The specific hours to be provided by the Providers shall be based upon the requirements of the Department of Obstetrics and Gynecology (the "Department") and Open Door, determined by Phelps in consultation with Open Door and shall initially include the hours set forth on Schedules A (with respect to Phelps) and B (with respect to Open Door), such Schedules shall be subject to modification by (i) Phelps with respect to Schedule A, and (ii) Open Door, with respect to Schedule B.  Open Door shall, on or before the 1st of each month, provide Phelps with a written monthly schedule for Physician and Midwife services including, on-call coverage at Phelps.  Such Schedules shall be subject to the approval of Phelps which approval shall not be unreasonably withheld or delayed.

IV.  <u>Services at Phelps</u>

In addition to providing patient care services at Phelps, Open Door and each of the Physicians providing services on behalf of Open Door shall be responsible to assist Phelps' Director of Obstetrics & Gynecology ("OB/GYN") in the operation of the Department including:

A.  Assisting in the implementation of policies, procedures and methods of operation, complying with and enforcing the bylaws, rules and regulations of the Hospital and its medical staff, as well as the Standards set forth by the Joint Commission on Accreditation of Health-Care Organizations, the American Medical Association, and the American Hospital Association, all as they apply to the Department.

B.  Assisting, within the Department, in the compliance with all applicable Federal, state and local laws, ordinances, rules and regulations, and policies and procedures established by all governmental agencies including, without limitation, all standards of care as specified under the P-CAP Program.

C.  Providing clinic coverage in the Department as provided in Schedule A or as otherwise mutually agreed from time to time.  Providing 24 hour (365 day) on-call services, with respect to its duties hereunder.

    D.      Cooperating with the Hospital regarding the utilization review, quality assurance and medical audit process of the Department and maintaining the activities of the Department consistent with the recommendations established by these processes.

    E.      Assisting the Hospital as reasonably requested in the administration of the Department.

V.    Administrative & Supervisory Services provided by Phelps

    A.      Maintain case management and support services for pre-natal Patients once the Patient is transferred to Phelps, as well as compliance with all of the requirements of the New York State P-CAP program.

    B.      Maintain a trained and effective support staff for the program with such services as are mandated by State and Federal laws.

    C.      Maintain communication with Open Door regarding the progress of Patients during gestation and supply Open Door with birthing information as agreed upon (within 48 hours of delivery), and promptly transfer to Open Door all Patient medical records and other information necessary for Open Door to provide treatment to Patients.

    D.      Provide prenatal billing services for all visits (other than deliveries) which occur at Phelps.

    E.      Coordinate credentialing of OB staff with Director of Personnel at Open Door.

    F.      Maintain adequate facilities for the provision of all services covered by this Agreement, including pre-natal visits and deliveries.

VI.    Administration & Supervisory Services provided by Open Door

    A.      Maintain case management and support services for pre-natal Patients until such time as the Patient is transferred to Phelps; as well as compliance with the requirements of the New York State P-CAP program.

    B.      Maintain a trained and effective support staff for the program with such services as are mandated by State and Federal laws.

    C.      Provide facilities which are dedicated to the program at Sleepy Hollow, Port Chester, and Ossining.

    D.      Provide full time case managers who will be responsible for Patient compliance and follow-up within P-CAP standards.

    E.      Provide pre-natal billing services for all visits at Open Door and billing for in-patient services performed by the midwives, OB/GYN and covering providers.

321270.02

F.    Promptly transfer records to Phelps with complete information on pre-natal service and medical findings.  Maintain communications with Phelps with respect to all program participants.

G.    Provide outreach services to insure that community residents are knowledgeable about the program emphasizing the importance of first trimester enrollment.

VII.  Compensation/Billing

A.    Phelps.  During the initial year of this Agreement, Phelps shall pay Open Door (subject to adjustment as provided below) Two Hundred Eighty Seven Thousand Five Hundred Dollars in year one and Three Hundred Thousand Dollars in year two, which shall be payable in twelve (12) monthly installments commencing with September 1, 2003 as discussed in Schedule D and continuing on the first day of each calendar month thereafter.  The parties agree that the compensation provided for under this Agreement is consistent with the fair market value of the services rendered hereunder.

B.    Open Door shall be responsible for all compensation due to Providers for services rendered under this Agreement.  In no event shall any Provider have the right to seek any compensation, fringe benefits or other remuneration from Phelps for such services.

i.    Subject to paragraph (ii) below, all hospital and ambulatory services provided hereunder by Phelps shall be billed and collected by Phelps.  At Open Door's option, all billing and collection with respect to professional fees relating to services rendered by Providers under this Agreement at either Open Door or Phelps shall be carried out in (a) the name and billing number of the individual Provider, (b) the name and billing number of Open Door, or (c) any other legally permissible group name and billing number designated by Open Door.  All billing and collections for professional fees shall be performed by Open Door either directly or utilizing such contractors or subcontractors as Open Door may determine in its sole discretion.  In the event either party or any Provider is erroneously reimbursed directly or otherwise receives payment for services at Phelps or Open Door to which such party or Provider is not entitled under the terms of this Agreement, the party or Provider receiving such payment shall promptly deliver such payment to Phelps or Open Door.  Phelps hereby agrees and shall cause each Provider to agree to execute such additional documentation as may be necessary, in the opinion of Phelps and/or its counsel, to effectuate or evidence such assignment.

ii.   At Phelps's option, all billing and collection with respect to all hospital services, shall be carried out in Phelps' institutional billing numbers. All hospital billing and collections shall be performed by Phelps either

6

directly or utilizing such contractors or subcontractors as Phelps may determine in its sole discretion.

C.    It is expressly acknowledged by the parties hereto that Open Door Providers are "independent contractors" of Phelps, and nothing in this Agreement is intended or shall be construed to create with Phelps an employer/employee relationship or a joint venture relationship or to permit Open Door or any Provider to incur any obligation or enter into any agreement on behalf of Phelps, provided that the services to be provided hereunder by Open Door and each Provider at Phelps shall be provided in a manner consistent with Provider standards governing such services, the By-laws, rules and regulations of Phelps and its Medical Staff and the provisions of this Agreement. Open Door and each Provider understands and agrees that Phelps will not withhold on behalf of Open Door or such Provider any sums (or make any payments) for income tax, unemployment insurance, social security, or any other withholding pursuant to any law or requirement of any governmental body relating to Open Door or the Provider, or make available to Open Door or the Provider any of the benefits afforded to employees of Phelps and that all of such payments, withholdings, and benefits, if any, are the sole responsibility of Open Door and the Provider. In the event the Internal Revenue Service or any other governmental agency should question or challenge the independent contractor status of Open Door or any Provider, Phelps shall have the right to participate in any discussion or negotiation occurring with such agency or agencies, irrespective of whom or by whom such discussion or negotiation is initiated. Open Door and each Provider hereby jointly and severally indemnify and hold Phelps, its members, trustees, officers and employees harmless against any and all claims, costs and damages asserted against, incurred or required to be paid by any such person arising from a breach of Open Door's or such Provider's obligations under this section. This section shall survive termination of this agreement.

VIII.  <u>Providers</u>

A.    <u>Qualifications</u>. As a continuing condition precedent to all parties obligations under this Agreement and prior to the provision of any services by any Physician hereunder, such Physician shall: (i) hold a currently valid and unlimited license and registration to practice medicine in the State of New York; (ii) be board certified or board eligible in Obstetrics and/or Gynecology and hold and maintain in good standing, membership on Phelps' Medical Staff with appropriate privileges, in accordance with Phelps' policies and be credentialed to provide services at Open Door in accordance with Open Door's policies; (iv) hold and maintain a currently valid Drug Enforcement Agency (DEA) certification; and (v) be a Provider under the Medicare and Medicaid Programs. All midwives shall be certified in accordance with New York law and shall maintain appointments at Phelps and Open Door in accordance with the rules and regulations of Phelps and Open Door, respectively, regarding such appointments. Proof of such licensure and accreditation will be supplied to Phelps and Open Door. The health status of all Providers must be submitted to Phelps and Open Door as outlined in

7

NYSDOH standards. Written verification of the above shall be submitted to the human resource department of Phelps by Open Door.

B.  Representatives. Phelps and Open Door shall each designate an individual to serve as liaison between the parties for purposes of implementing each parties duties hereunder.

C.  Malpractice Insurance. Through the term of this Agreement, Open Door shall maintain and shall maintain or cause each Provider providing services hereunder to maintain medical malpractice insurance, on an occurrence basis, in the minimum amounts required for all members of the Medical Staff of Phelps through such insurance carrier(s) selected by Open Door and approved by Phelps (provided Phelps shall not unreasonably withhold such approval), and shall provide Phelps with evidence of same upon request. Coverage available to Open Door and Providers under the Federal Tort Claims Act shall satisfy Open Door's obligations under this section.

D.  Incident Reporting. In the event any provider is involved in any situation which requires a report pursuant Public Health Law 2805-I (Incident Reporting) all parties shall be advised of the nature of the situation giving rise to the report and the Parties shall discuss the potential impact of the situation, if any, including but not limited to the appropriate corrective action.

## IX.  Term of Agreement

A.  Term. The initial term of this Agreement shall be two (2)years, unless otherwise terminated as herein provided. Any party may terminate this Agreement at any time, with or without cause, upon ninety (90) days written notice to the other Parties.

B.  This Agreement may be terminated at any time by written mutual agreement.

C.  The right of any Provider to provide services hereunder may be terminated immediately without prior written notice at any time by Phelps for just cause, which may include, but need not be limited to any one or more of the following:

(i).   A suspension, limitation, or revocation to a Physician's license to practice medicine in the State of New York which is not stayed within ten (10) days of such suspension, limitation or revocation.

(ii).  A termination, suspension, or non-renewal of a Physician's medical staff privileges (a) at Phelps in accordance with the medical staff bylaws, rules and regulations and policies of Phelps or (b) at Open Door, in accordance with its bylaws, rules and regulations.

(iii). A Physician's failure or inability to qualify for Provider liability insurance coverage.

8

(iv).   Termination or suspension of a Physician's certification by such Physician's specialty Board.

(v).    Termination or suspension of a Physician's status as a Medicare or Medicaid Provider.

(vi).   Termination, suspension, or revocation of a Physician's DEA number.

(vii).  A Physician's death or disability.  Disability shall be defined as such Physician's inability to carry out such Physician's obligations under this Agreement for a consecutive period in excess of ninety (90) consecutive days or any one hundred and twenty (120) or more days during any 365 day period.

(viii). Other conduct which in the fair and reasonable opinion of the Chief Executive Officer (or designee) of Phelps is such as to create a threat to the health, safety or welfare of patients, demonstrates a failure to carry out Open Door's Provider responsibilities hereunder, or is otherwise contrary to the best interest and welfare of the Hospital and its patients.

Upon any such termination, Open Door shall promptly provide a replacement provider, who meets the requirements set forth above and is reasonably acceptable to Phelps.

D.  At Phelps' option and in accordance with Phelps' Policies, Phelps may suspend any Provider from the provision of services hereunder during the pendency of any corrective action initiated pursuant to the Medical Staff Bylaws.  In the event that such corrective action includes a summary suspension of Medical Staff privileges, Phelps may suspend any and all of such Provider's services hereunder without compensation for the suspension period (in the sole discretion of Phelps). Should the Board fail to sustain the summary suspension of Medical Staff privileges, such Provider may resume his obligations under this Agreement.

E.  In the event that any party shall give notice to any other party (such notice shall be sent to all parties) that it has defaulted substantially in the performance of any obligation under this Agreement and such default has not been cured to the reasonable satisfaction of the non-defaulting parties within thirty (30) days, following the giving of such notice, the non-defaulting parties (or any one of them) shall have the right to terminate this Agreement as of the end of such notice period.

F.  In the event that there is a change in the Medicare or Medicaid Acts, regulations, or general instructions (or in the application thereof), the adoption of new legislation, or a change in any other third party payor reimbursement system, any of which materially affects the reimbursement which Open Door or Phelps may receive for its or their respective services furnished to Patients, such party may by notice propose a new basis for compensation for the services furnished pursuant to this Agreement.  If such notice of new basis is given and if the parties, using their best efforts and acting in good faith, are unable within one hundred and twenty

9

(120) days thereafter to agree upon a new basis for compensation, any party may terminate this Agreement by thirty (30) days prior notice to the others on any future date specified in such notice.  In addition, Phelps may terminate this Agreement upon thirty (30) days prior written notice to Open Door in the event the Department or the Department is decertified, voluntarily or involuntarily.

G..     In the event either party loses its license, certification or accreditation to provide the services covered by this Agreement, the other party shall have the right to immediately terminate this Agreement on notice to such party.

Upon termination of this Agreement, Open Door shall be entitled to receive the accrued but unpaid compensation owed by Phelps and shall not be entitled to any additional compensation hereunder or otherwise.

X.  Miscellaneous.

A.     Notwithstanding any other provisions in this Agreement, Open Door shall remain responsible for insuring that all services provided hereunder at locations operated by them shall comply with all applicable federal, state and local laws, ordinances, rules, regulations and policies and procedures assuring that they are consistent with the requirements of Provider standards established by all relevant certifying or accrediting entities.

B.     Notwithstanding any other provisions in this Agreement, Phelps shall remain responsible for insuring that all services provided hereunder at locations operated by them shall comply with all applicable federal, state and local laws, ordinances, rules, regulations and policies and procedures assuring that they are consistent with the requirements of Provider standards established by all relevant certifying or accrediting entities.

C.     This agreement is made in the State of New York and shall be interpreted, construed and governed by the laws of New York State without giving effect to the rules of conduct law.

D.     No assignment or subcontract of this Agreement, or the rights or obligations hereunder shall be valid without the prior written consent of all parties. With approval from Phelps, which shall not be unreasonably withheld, nothing in this section shall be construed as prohibiting or restricting Open Door from contracting with professional corporations, medical groups or other entities, including, without limitation, Sleepy Hollow Medical Group, P.C., for the services of Providers with privileges at Phelps rendering treatment under this Agreement.

E.     This Agreement may only be amended by a written instrument executed by all parties hereto.

10

IN WITNESS WHEREOF, the Parties hereto have executed this agreement as of the date first written above.

OPEN DOOR FAMILY MEDICAL CENTER INC.

By _____

Lindsay Farrell, President & CEO

PHELPS MEMORIAL HOSPITAL CENTER

By _____

Keith F. Safian, President & CEO

11

Schedule A & B

# SLEEPY HOLLOW MEDICAL GROUP, PC
## MARCH 2004
### HOSPITAL ONCALL SCHEDULE

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| NICOLE STEGMAN 19 | SARINA DISTEFANO MD 1 | INGRID DELER-GARCIA CRM / NICOLE STEGMAN MD 2 | LAWRENCE MENDELOWITZ MD 3 | MARK MENDELOWITZ MD 4 | SARINA DISTEFANO MD 5 | LAWRENCE MENDELOWITZ MD 6 |
| LAWRENCE MENDELOWITZ MD 7 | SARINA DISTEFANO MD 8 | INGRID DELER-GARCIA CRM / LAWRENCE MENDELOWITZ MD 9 | DOMINIC ARGO MD 10 | NICOLE STEGMAN MD 11 / INGRID DELER-GARCIA | INGRID DELER-GARCIA CRM / LAWRENCE MENDELOWITZ MD 12 | INGRID DELER-GARCIA CRM / MARK MENDELOWITZ MD 13 |
| DOMINIC ARGO MD 14 | SARINA DISTEFANO MD 15 | LAWRENCE MENDELOWITZ MD 16 / INGRID DELER-GARCIA CRM | DOMINIC ARGO MD 17 | SARINA DISTEFANO MD 18 | MARK MENDELOWITZ MD 19 / INGRID DELER-GARCIA CRM | SARINA DISTEFANO MD 20 / INGRID DELER-GARCIA |
| SARINA DISTEFANO MD 21 | NICOLE STEGMAN MD 22 | LAWRENCE MENDELOWITZ MD 23 / INGRID DELER-GARCIA CRM | MARK MENDELOWITZ MD 24 | SARINA DISTEFANO MD 25 | NICOLE STEGMAN MD 26 | LAWRENCE MENDELOWITZ MD 27 |
| LAWRENCE MENDELOWITZ MD 28 | SARINA DISTEFANO MD 29 | NICOLE STEGMAN MD 30 / INGRID DELER-GARCIA CRM | LAWRENCE MENDELOWITZ MD 31 | | | |

SCHEDU 1 & B

# March 2004

## 1st Call Midwives–Woman's Health/OB

updated 1/30/04

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Lisha Coster 914-264-0936 | Patti Mahoney 914-264-0503 | Laura Cross 914-264-0676 | Sheila Townsend 914-264-0863 | Christina Mannion 914-264-0941 | | |
| | **1** Patti D/N Sheila -OOD | **2** Patti D Laura-N Sheila -RB | **3** Laura-D/N Chris-RB | **4** Sheila D/N Chris-RB | **5** Lisha-D/N Laura -OOD | **6** Chris-24 Hrs |
| **7** Lisha 24 Hrs | **8** Laura-D/N Patti-V Sheila -OOD | **9** Lisha D/N Patti-V Sheila -RB | **10** Laura D/N Patti-V Chris-RB | **11** Sheila D/N Patti-V Chris-RB | **12** Chris-D/N Patti-V Laura-OOD | **13** Lisha-24 Hrs Patti-V |
| **14** Patti-V Chris-D Lisha-N | **15** Sheila-D/N Chris -OOD | **16** Sheila-D Laura-N Laura- RB | **17** Patti- D/N Sheila -RB | **18** Laura-D/N Chris-RB | **19** Lisha-D/N Patti-OOD | **20** Lisha-24 Hrs |
| **21** Chris 24 Hrs | **22** Laura-N Patti –D Sheila-V Patti-OOD | **23** Patti-D Laura-v Sheila-v Chris-RB | **24** Patti- N/D Sheila-v Christine -RB | **25** Laura D/N Sheila-V Lisha-RB | **26** Laura-D Lisha –N Sheila-V Chris -OOD | **27** Lisha -24 Hrs Sheila-V |
| **28** Chris-24 Hrs Sheila-V | | | | | | |

**SCHEDULE C**

**NYS MEDICAID FEE SCHEDULE**

**CODES**

76800
76805
76815
76816
76818
76825
76830
76855
76756
7857

SCHEDULE D
## Phelps-Open Door Payment Schedule

**Payment Schedule Year One**

| | | |
|---|---|---|
| September 2003 | | 30,000 |
| October 2003 | | 30,000 |
| November 2003 | | 30,000 |
| December 2003 | | 21,944.00 |
| Janaury 2004 | | 21,944.00 |
| February 2004 | | 21,944.00 |
| March 2004 | | 21,944.00 |
| April 2004 | | 21,944.00 |
| May 2004 | | 21,944.00 |
| June 2004 | | 21,944.00 |
| July 2004 | | 21,944.00 |
| August 2004 | | 21,944.00 |
| | Total | 287,496 |

**Payment Schedule Year Two**

| | | |
|---|---|---|
| September 2004 | | 25,000.00 |
| October 2004 | | 25,000.00 |
| November 2004 | | 25,000.00 |
| December 2004 | | 25,000.00 |
| Janaury 2005 | | 25,000.00 |
| February 2005 | | 25,000.00 |
| March 2005 | | 25,000.00 |
| April 2005 | | 25,000.00 |
| May 2005 | | 25,000.00 |
| June 2005 | | 25,000.00 |
| July 2005 | | 25,000.00 |
| August 2005 | | 25,000.00 |
| | Total | 300,000.00 |

## PHELPS MEMORIAL HOSPITAL CENTER

### HIPAA BUSINESS ASSOCIATE ADDENDUM
### (INCLUDING ELECTRONIC TRANSACTION STANDARDS)

This Addendum, dated as of September 1, 2003 ("Addendum"), supplements and is made a part of the Services Agreement (as defined below) by and between Phelps Memorial Hospital Center ("Covered Entity") and Open Door Family Medical Center, Inc. ("Business Associate").

WHEREAS, Covered Entity and Business Associate are parties to the Service Agreement pursuant to which Business Associate provides certain services to Covered Entity. In connection with Business Associate's services, Business Associate creates or receives Protected Health Information from or on behalf of Covered Entity, which information is subject to protection under the Federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 ("HIPAA") and related regulations promulgated by the Secretary ("HIPAA Regulations").

WHEREAS, in light of the foregoing and the requirements of the HIPAA Regulations, Business Associate and Covered Entity agree to be bound by the following terms and conditions:

1.      **Definitions.**

(a)      General. Terms used, but not otherwise defined, in this Addendum shall have the same meaning as those terms in the Privacy Rule.

(b)      Specific.

(i)      Individual. "Individual" shall have the same meaning as the term "individual" in 45 CFR 164.501 and shall include a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g).

(ii)      Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR part 160 and part 164, subparts A and E.

(iii)      Protected Health Information. "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR 164.501, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

(iv)      Required By Law. "Required by Law" shall have the same meaning as the term "required by law" in 45 CFR 164.501.

(v)      Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

1

(vi)    Services Agreement.    "Services Agreement" shall mean any present or future agreements, either written or oral, between Covered Entity and Business Associate under which Business Associate provides services to Covered Entity which involve the use or disclosure of Protected Health Information.

2.    **Obligations and Activities of Business Associate**.

(a)    Use and Disclosure. Business Associate agrees to not use or disclose Protected Health Information other than as permitted or required by the Services Agreement or as Required By Law.

(b)    Appropriate Safeguards. Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by the Services Agreement.    Without limiting the generality of the foregoing, Business Associate agrees to protect the integrity and confidentiality of any Protected Health Information it electronically exchanges with Covered Entity.

(c)    Mitigation.    Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Addendum.

(d)    Reporting. Business Associate agrees to report to Covered Entity any use or disclosure of the Protected Health Information not provided for by the Services Agreement of which it becomes aware.

(e)    Agents. Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through this Addendum to Business Associate with respect to such information.

(f)    Access to Designated Record Sets. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner designated by the Covered Entity, to Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR 164.524.

(g)    Amendments to Designated Record Sets. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR 164.526 at the request of Covered Entity or an Individual, and in the time and manner designated by the Covered Entity.

(h)    Access to Books and Records. Business Associate agrees to make internal practices, books, and records, including policies and procedures and Protected Health

Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary, in a time and manner designated by the Covered Entity or designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

(i)    Accountings. Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

(j)    Requests for Accountings. Business Associate agrees to provide to Covered Entity or an Individual, in the time and manner designated by the Covered Entity, information collected in accordance with Section 2.i. of this Addendum, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

3.    **Permitted Uses and Disclosures by Business Associate.**

(a)    Services Agreement.    Except as otherwise limited in this Addendum, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the Services Agreement, provided that such use or disclosure would not violate the Privacy Rule if done by Covered Entity or the minimum necessary policies and procedures of the Covered Entity.

(b)    Use for Administration of Business Associate. Except as otherwise limited in this Addendum, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

(c)    Disclosure for Administration of Business Associate. Except as otherwise limited in this Addendum, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that disclosures are Required by Law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

4.    **Permissible Requests by Covered Entity.**  Except as set forth in Section 3 of this Addendum, Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by Covered Entity.

5.    **Term and Termination**.

(a)    Term. This Addendum shall be effective as of the date of this Addendum, and shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

(b)    Termination for Cause. Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity shall either:

(i)    Provide an opportunity for Business Associate to cure the breach or end the violation.  If Business Associate does not cure the breach or end the violation within the time specified by Covered Entity, Covered Entity shall terminate: (A) this Addendum; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected Health Information; and (C) such other provisions, if any, of the Services Agreement as Covered Entity designates in its sole discretion;

(ii)    Immediately terminate: (A) this Addendum; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected Health Information; and (C) such other provisions, if any, of the Services Agreement as Covered Entity designates in its sole discretion if Business Associate has breached a material term of this Addendum and cure is not possible; or

(iii)    If neither termination nor cure are feasible, Covered Entity shall report the violation to the Secretary.

(c)    Effect of Termination.

(i)    Except as provided in paragraph ii. of this Section 5.c., upon termination of this Addendum, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

(ii)    In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of this Addendum to such Protected Health Information and limit further uses and disclosures of

4

such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

6.    **Electronic Transaction Standards**.

    (a)    Compliance with HIPAA Standards.  When providing its services and/or products, Business Associate shall comply with all applicable HIPAA standards and requirements (including, without limitation, those specified in 45 CFR Part 162) with respect to the transmission of health information in electronic form in connection with any transaction for which the Secretary has adopted a standard under HIPAA ("Covered Transactions").  Business Associate will make its services and/or products compliant with HIPAA's standards and requirements no less than thirty (30) days prior to the applicable compliance dates under HIPAA.  Business Associate represents and warrants that it is aware of all current HIPAA standards and requirements regarding Covered Transactions, and Business Associate shall comply with any modifications to HIPAA standards and requirements which become effective from time to time.  Business Associate agrees that such compliance shall be at its sole cost and expense, which expense shall not be passed on to Covered Entity in any form, including, but not limited to, increased fees.

    (b)    Agents and Subcontractors.  Business Associate shall require all of its agents and subcontractors (if any) who assist Business Associate in providing its services and/or products to comply with all applicable requirements of HIPAA, including without limitation, compliance with 45 CFR Part 162.

7.    **Miscellaneous**.

    (a)    Regulatory References. A reference in this Addendum to a section in the Privacy Rule means the section as in effect or as amended.

    (b)    Amendment. The Parties agree to take such action as is necessary to amend the  Services Agreement from time to time as is necessary for Covered Entity to comply with the requirements of the Privacy Rule and HIPAA.

    (c)    Survival. The respective rights and obligations of Business Associate under Section 5.c. of this Addendum shall survive the termination of the Services Agreement.

    (d)    Interpretation. Any ambiguity in this Addendum shall be resolved to permit Covered Entity to comply with the Privacy Rule.

    (e)    Miscellaneous. The terms of this Addendum are hereby incorporated into the Services Agreement.  Except as otherwise set forth in Section 7.d. of this Addendum, in the event of a conflict between the terms of this Addendum and the terms of the Services Agreement, the terms of this Addendum shall prevail.  The terms of the Agreement which are not modified by this Addendum shall remain in full force and effect in accordance with the terms thereof.   The Services Agreement together with this Addendum constitutes the entire agreement between the parties with respect to the

subject matter contained herein.  This Addendum may be executed in counterparts, each of which when taken together shall constitute one original.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the date set forth above.

**PHELPS MEMORIAL HOSPITAL CENTER**

By: _____

Name:  Kerry L. Pisano

Title:  VP, Support Services & Privacy Officer

**OPEN DOOR FAMILY MEDICAL CENTER, INC.**

By: _____

Name: _____

Title: _____