**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

ROGER STEVEN CARDENAS, an infant, by his
Mother and Natural Guardian, EUDOCIA
ANGUISACA, and EUDOCIA ANGUISACA,
individually,

       Plaintiffs,

        against -

PHELPS MEMORIAL HOSPITAL CENTER, OPEN
DOOR FAMILY MEDICAL CENTER, INC. and
OSSINING OPEN DOOR,

       Defendants.

------------------------------------------------------------------- x

PHELPS MEMORIAL HOSPITAL CENTER,

       Third-Party Plaintiff,

        against -

OPEN DOOR FAMILY MEDICAL CENTER, INC.
and OSSINING OPEN DOOR,

       Third-Party Defendants.

------------------------------------------------------------------- x

ECF CASE

07 Civ. 11145 (KMK)(GAY)

**DECLARATION**
**OF LI YU**

LI YU, pursuant to 28 U.S.C. § 1746, declares the following under penalty of perjury:

1.     I am an Assistant United States Attorney in the office of Michael J. Garcia,

United States Attorney for the Southern District of New York, attorney for defendant and

third-party defendant the Open Door Family Medical Center, Inc. and its office in Ossining,

New York, defendant Ossining Open Door (collectively, "Open Door"), in the above-

captioned action.  I have been assigned to defend this matter, and am familiar with the

proceedings herein.  I make this declaration in support of the Open Door's Motion to

Substitute the United States as Defendant and Third-Party Defendant and to Dismiss the Verified Amended Complaint as Against the United States.

2.     Attached hereto as Exhibit A is a true and correct copy of a Verified Complaint filed on or about December 1, 2006 in New York state court by plaintiffs Roger Steven Cardenas and his mother Eudocia Anguisaca (collectively, the "Plaintiffs") against defendant and third-party plaintiff Phelps Memorial Hospital Center ("Phelps").

3.     Attached hereto as Exhibit B is a true and correct copy of a Third-Party Complaint (the "Phelps Complaint") filed on or about November 9, 2007 in New York state court by Phelps against Open Door seeking contribution in connection with the Plaintiffs' lawsuit against Phelps.

4.     Attached hereto as Exhibit C is a true and correct copy of a Verified Amended Complaint filed on or about November 19, 2007 in New York state court by the Plaintiffs against both Phelps and Open Door.

5.     Attached hereto as Exhibit D is a true and correct copy of an Answer to the Phelps Complaint filed on January 28, 2008 in the United States District Court for the Southern District of New York by the United States on behalf of Open Door.

6.     Attached hereto as Exhibit E is a true and correct copy of a Verified Bill of Particulars served by Plaintiffs on Phelps on or about January 25, 2007.

7.     Attached hereto as Exhibit F is a true and correct copy of the Declaration of Richard G. Bergeron dated February 20, 2008.

8.     Attached hereto as Exhibit G is a true and correct copy of a Certification of Michael J. Garcia, the United States Attorney for the Southern District of New York, pursuant to 28 U.S.C. § 2679(d) and 28 C.F.R. § 15.4 and dated December 7, 2007, which

was in connection with the removal of this action from New York state court to the United

States District Court for the Southern District of New York.

Dated: New York, New York
       March 4, 2008

                                        MICHAEL J. GARCIA
                                        United States Attorney

                              By:       _____

                                        LI YU
                                        Assistant United States Attorney
                                        Tel.: (212) 637-2734
                                        Fax: (212) 637-2686
                                        Email:  li.yu@usdoj.gov

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------X   Index No.
ROGER STEVEN CARDENAS, an Infant, by his Mother
and Natural Guardian, EUDOCIA ANGUISACA, and
EUDOCIA ANGUISACA, Individually,
                                      Plaintiffs,
              -against-                                   VERIFIED
                                                          COMPLAINT
PHELPS MEMORIAL HOSPITAL CENTER,
                                      Defendant.
-------------------------------------------------X

1.  Plaintiffs, through their attorneys, Fitzgerald & Fitzgerald, P.C., allege, upon

information and belief, the following:

## THE PARTIES

2.  Plaintiff, ROGER STEVEN CARDENAS, is an infant, having been born on

August 10, 2005.

3.  Plaintiff, EUDOCIA ANGUISACA, is an adult over the age of eighteen (18) and

is the parent and natural guardian of the infant plaintiff.

4.  Defendant, PHELPS MEMORIAL HOSPITAL CENTER, is a hospital existing

under and by virtue of the laws of the State of New York, with its principal place of

business located at 701 North Broadway; Sleepy Hollow, NY 10591.

## AS AND FOR A FIRST CAUSE OF ACTION
## ON BEHALF OF INFANT
## FOR PERSONAL INJURIES

5.  Defendant undertook to attend and provide medical care for plaintiffs in a

reasonable, proper, and skillful manner.

6.  Defendant and its agents, servants, and/or employees were negligent and

committed malpractice in their treatment of plaintiffs.



7.  Plaintiffs sustained severe and permanent injuries as a result of the negligence and malpractice of defendant.

8.  The injuries and damages sustained by plaintiffs were caused solely by the negligence of the defendant and its agents, servants, and/or employees without any negligence on the part of the plaintiffs contributing thereto.

9.  Plaintiffs sustained damages in excess of the jurisdictional limits of all lower courts, which might otherwise have jurisdiction.

## AS AND FOR A SECOND CAUSE OF ACTION
## ON BEHALF OF INFANT
## FOR LACK OF INFORMED CONSENT

10. Defendant and its agents, servants, and/or employees performed some and failed to perform other medical treatments, procedures, surgeries, and/or diagnostic procedures upon plaintiffs without obtaining the informed consent of the plaintiffs.

11. Defendant and its agents, servants, and/or employees failed to advise the plaintiffs of the risks, dangers, and consequences associated with the performance or non-performance of the aforesaid medical treatments, procedures, surgeries, and/or diagnostic procedures.

12. A reasonably prudent person in the plaintiffs' position would not have permitted, allowed, or undergone the medical treatments, procedures, surgeries, and/or diagnostic procedures and would have chosen a different course of treatment if she had been fully informed of the risks, dangers, and consequences.

13. As a result of the aforesaid medical treatments, procedures, surgeries, and/or diagnostic procedures being withheld or performed upon the plaintiffs, without the plaintiffs' informed consent, plaintiffs were personally damaged.

P. 13    NOV-14-2007 17:43

FILE No.484 12/18 '06 17:17    ID:MLMIC    FAX:2125769717    PAGE  6/ 11

12/18/2006 15:03 FAX  914 986 1557        MEDICAL STAFF OFFICE                    ☑ 005/010



14. Such a lack of informed consent is a proximate cause of plaintiffs' damages for which relief is sought herein.



15. Plaintiffs sustained severe and permanent injuries as a result of the defendant's failure to obtain an informed consent.



16. The injuries and damages sustained by plaintiffs were caused solely by the negligence of the defendant and its agents, servants, and/or employees without any negligence on the part of plaintiffs contributing thereto.



17. Plaintiffs sustained damages in excess of the jurisdictional limits of all lower courts, which might otherwise have jurisdiction.

### AS AND FOR A THIRD CAUSE OF ACTION ON BEHALF OF PARENT AND NATURAL GUARDIAN FOR A DERIVATIVE CLAIM



18. As a result of the injuries sustained by the infant due to the negligence and malpractice of defendant and its agents, servants, and/or employees, and the lack of informed consent, plaintiff, parent and natural guardian, incurred expenses and obligations and lost the society and services of the infant plaintiff.



19. Infant required extraordinary care as a result of defendant's negligence. Said extraordinary care was provided by adult plaintiff. As a result of the necessity of providing said extraordinary care, plaintiff, parent and natural guardian, was damaged by the loss of earnings.



20. Plaintiff, parent and natural guardian, is entitled to the fair value of the extraordinary care and for damages sustained in excess of the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

12/18/2006 15:03 FAX  814 388 1557          MEDICAL STAFF OFFICE                    ✍ 006/010

## AS AND FOR A FOURTH CAUSE OF ACTION
## ON BEHALF OF ADULT PLAINTIFF
## FOR DAMAGES FOR MALPRACTICE

*Same as 5*

21. Adult plaintiff was a patient of the defendant.

*Same as 5*

22. Defendant undertook to attend and care for adult plaintiff in a reasonable, proper, and skillful manner.

23. Defendant and its agents, servants, and/or employees were negligent and committed malpractice in their treatment of adult plaintiff.

24. Adult plaintiff sustained severe and permanent injuries as a result of the negligence and malpractice of defendant exceeding the jurisdictional limits of all lower courts, which would otherwise have jurisdiction.

## STATEMENT REGARDING EXCEPTIONS IN CPLR ARTICLE 1602

25. One or more of the exceptions in CPLR 1602, including but not limited to Subsection 2 (iv) and 7 are applicable to all causes of action and defendant is jointly and severally liable with all other tortfeasors whether parties to this action or not.

Dated:        Yonkers, New York
              December 1, 2006

              FITZGERALD & FITZGERALD, P.C.
              By: John M. Dale, Esq.
              Attorneys for plaintiff
              538 Riverdale Avenue
              Yonkers, NY 10705
              (914) 378-1010
              Our File No.: A05124

12/13/2006 15:03 FAX   914 368 1557        MEDICAL STAFF OFFICE                    @007/010

## VERIFICATION

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF WESTCHESTER      )

   EUDOCIA ANGUISACA, being duly sworn, deposes and says:

   I am the Mother and Natural Guardian of Infant, ROGER STEVEN CARDENAS, a
plaintiff herein. I also have individual claims. I have read the SUMMONS and COMPLAINT
and know the contents thereof and the same is true to my own knowledge, except as to the
matters therein stated to be alleged on information and belief, and as to those matters I believe
them to be true.

                                          _Eudocia Anguisaca_
                                          EUDOCIA ANGUISACA

Sworn to before me this
_26_ day of October, 2006

_[signature]_
Notary Public

MERCEDES GUINA
Commissioner of Deeds
City of Yonkers
Certificate Filed in Westchester County
Commission Expires _12/31/06_

12/19/2006 15:04 FAX  914 388 1557          MEDICAL STAFF OFFICE                        ☒ 008/010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
----------------------------------------------X      Index No.
ROGER STEVEN CARDENAS, an Infant, by his Mother
and Natural Guardian, EUDOCIA ANGUISACA, and
EUDOCIA ANGUISACA, Individually,
                                     Plaintiffs,           **CERTIFICATE OF**
           -against-                                       **MERIT MEDICAL**
                                                           **MALPRACTICE**
PHELPS MEMORIAL HOSPITAL CENTER,
                                     Defendant.
----------------------------------------------X

        The undersigned, an attorney duly admitted to practice before the Courts of the

State of New York, hereby affirms the following under the penalties of perjury:

        1. I am associated with the firm of Fitzgerald & Fitzgerald, P.C., attorneys for the

plaintiffs herein. I am familiar with the facts and circumstances of this proceeding. This

affirmation is made upon information and belief, the source of your affirmant's

knowledge being the file maintained by this office.

        2. I have reviewed the facts of the case and have consulted with at least one

physician who is licensed to practice in this state or any other state and who I reasonably

believe is knowledgeable in the relevant issues involved in this action, and I have

concluded on the basis of such review and consultation that there is a reasonable basis for

the commencement of this action.

Dated:          Yonkers, New York
                December 1, 2006


                                        FITZGERALD & FITZGERALD, P.C.
                                        By: John M. Daly, Esq.
                                        Attorneys for plaintiffs
                                        538 Riverdale Avenue
                                        Yonkers, NY 10705
                                        (914) 378-1010
                                        Our File No.: A05124

# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
---------------------------------------------------------------X    Index No. 23710/06
ROGER STEVEN CARDENAS, an Infant, by his Mother
and Natural Guardian, EUDOCIA ANGUISACA, and
EUDOCIA ANGUISACA, Individually,

                    Plaintiffs,    **THIRD-PARTY
COMPLAINT**

      -against-

PHELPS MEMORIAL HOSPITAL CENTER,

                Defendant.
---------------------------------------------------------------X
PHELPS MEMORIAL HOSPITAL CENTER,    Index No.

                Plaintiff,

      -against-

OPEN DOOR FAMILY MEDICAL CENTER, INC.
And OSSINING OPEN DOOR,

                Defendants.
---------------------------------------------------------------X

RECEIVED

NOV - 9 2007

TIMOTHY C. IDONI
COUNTY CLERK
COUNTY OF WESTCHESTER

      The third-party plaintiff, PHELPS MEMORIAL HOSPITAL CENTER, by its attorneys,

O'CONNOR, McGUINNESS, CONTE, DOYLE & OLESON, alleges upon information and belief,

the following:

      FIRST:      That defendant and third-party plaintiff, PHELPS MEMORIAL HOSPITAL

CENTER, is a hospital existing under and by virtue of the laws of the State of New York, with its

principal place of business located at 701 North Broadway, Sleepy Hollow, New York 10591.

      SECOND:     That third-party defendant, OPEN DOOR FAMILY MEDICAL CENTER,

INC., is a family health clinic existing under and by virtue of the laws of the State of New York, with

its principal place of business located at 165 Main Street, Ossining, New York 10562.

THIRD:     That third-party defendant, OSSINING OPEN DOOR, is a family health clinic existing under and by virtue of the laws of the State of New York, with its principal place of business located at 165 Main Street, Ossining, New York 10562.

FOURTH:     That third-party defendants, OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR, offer pre-natal care to patients in the first two trimesters at a clinic located at 165 Main Street, Ossining, New York 10562.

FIFTH:     That third-party defendants, OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR, entered into a contract with defendant and third-party plaintiff, PHELPS MEMORIAL HOSPITAL CENTER, whereby OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR, offer pre-natal care to patients in the third trimester at the clinic located at PHELPS MEMORIAL HOSPITAL CENTER at 701 North Broadway, Sleepy Hollow, New York 10591.

SIXTH:     That third-party defendants, OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR, advise their pre-natal patients that labor and delivery will take place at PHELPS MEMORIAL HOSPITAL CENTER.

SEVENTH:     That third-party defendants, OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR, employ licensed nurse-midwives and other medical care providers to monitor and otherwise care for patients while in labor as well as to perform the delivery and care to the newborn immediately after birth.

EIGHTH:     That in August 2005, Patricia Mahoney, a licensed nurse-midwife, was employed by third-party defendants, OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR, and worked both at the clinic in Ossining and at the clinic's facilities at PHELPS MEMORIAL HOSPITAL CENTER.

NINTH:    That in December 2004, Eudocia Anguisaca first sought pre-natal care at the OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR at the facility located at 165 Main Street, Ossining, New York 10562.

TENTH:    That Eudocia Anguisaca received pre-natal care at the OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR at the facility located at 165 Main Street, Ossining, New York 10562 during her first and second trimesters.

ELEVENTH:    That during her third trimester, Eudocia Anguisaca received pre-natal care at the OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR, at their facility located at PHELPS MEMORIAL HOSPITAL CENTER at 701 North Broadway, Sleepy Hollow, New York 10591.

TWELFTH:    That on August 10, 2007, Eudocia Anguisaca delivered a male child at PHELPS MEMORIAL HOSPITAL CENTER.

THIRTEENTH:    That nurse-midwife, Patricia Mahoney, was present during the labor and delivery and supervised said labor and the delivery of Eudocia Anguisaca's son, Roger Steven Cardenas, born on August 10, 2005.

FOURTEENTH:    At all such times Patricia Mahoney, was acting as an agent, servant or employee of OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR.

FIFTEENTH:    That on December 13, 2006, PHELPS MEMORIAL HOSPITAL CENTER was served with a Summons and Complaint under Index No. 23710/06, alleging that Roger Steven Cardenas sustained permanent injuries as a result of the negligence and malpractice of PHELPS MEMORIAL HOSPITAL CENTER's agents, servants, and/or employees during labor and delivery and therafter on August 10, 2005. The Complaint and Plaintiffs' Bill of Particulars, copies of which are attached, allege that the care rendered during labor and delivery and immediately after birth was

negligently performed, that the mother's condition was not properly evaluated and appreciated, that the fetal heart rate was not properly monitored and that alleged abnormalities in the fetal heart tracings were not appreciated by those involved in the care and treatment.

SIXTEENTH: The care and treatment during the labor and delivery and immediately following delivery, were supervised and managed by Nurse Midwife Patricia Mahoney, who was at the time an employee of Third Party Defendant OPEN DOOR FAMILY HEALTH CENTER, INC. and OSSINING OPEN DOOR.

SEVENTEENTH: PHELPS MEMORIAL HOSPITAL CENTER alleges that should it be determined that it is in any way responsible to Plaintiffs for their claimed injuries and damages, it will have been the result of the actions or inactions of employees of OPEN DOOR FAMILY HEALTH CENTER, INC. and OSSINING OPEN DOOR, and thus PHELPS MEMORIAL HOSPITAL CENTER will be entitled to indemnity or contribution for that portion of Plaintiffs' injuries or damages brought about by the negligence of OPEN DOOR FAMILY HEALTH CENTER, INC. and OSSINING OPEN DOOR, and those employed by that entity or those acting under the direct supervision and control of that entity.

WHEREFORE, the defendant/third-party plaintiff, PHELPS MEMORIAL HOSPITAL CENTER, demands judgment against the third-party defendants, OPEN DOOR FAMILY MEDICAL CENTER, INC. and OSSINING OPEN DOOR, on the third-party complaint herein for indemnification for any and all damages recovered by the plaintiffs as against defendant/third-party plaintiff, PHELPS MEMORIAL HOSPITAL CENTER, together with the all costs, disbursements and attorneys' fees in connection with this action.

Dated: White Plains, New York
     November 6, 2007

Yours, etc.,

By: _____

ROCCO CONTE
O'CONNOR, McGUINNESS, CONTE
DOYLE & OLESON
Attorneys for Defendant/Third-Party
Plaintiff
PHELPS MEMORIAL HOSPITAL
CENTER
One Barker Avenue, Suite 675
White Plains, New York 10601
(914) 948-4500

TO:    Open Door Family Medical Center, Inc.
       165 Main Street
       Ossining, New York 10562
       (914) 941-1263

       Ossining Open Door
       165 Main Street
       Ossining, New York 10562
       (914) 941-1263

       Fitzgerald & Fitagerald, P.C.
       Attorneys for Plaintiffs
       538 Riverdale Avenue
       Yonkers, New York 10705
       (914) 378-1010
       File No. A05124

# Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------X   Index No.: 23710/06
ROGER STEVEN CARDENAS, an infant, by his mother and
natural guardian, EUDOCIA ANGUISACA, and EUDOCIA
ANGUISACA individually,

                                        Plaintiff(s),

                -against-


PHELPS MEMORIAL HOSPITAL CENTER, OPEN DOOR          AMENDED
FAMILY MEDICAL CENTER, INC., and OSSINING OPEN       SUMMONS
DOOR,
                                       Defendant(s).
-------------------------------------------------------------X
PHELPS MEMORIAL HOSPITAL CENTER,
                                    Third-Party Plaintiff(s),

                -against-


OPEN DOOR FAMILY MEDICAL CENTER, INC. and
OSSINING OPEN DOOR,
                                 Third-Party Defendant(s).
-------------------------------------------------------------X

To the above named defendants:
        You are hereby summoned to answer the complaint in this action and to serve a
copy of your answer or, if the complaint is not served with this summons, to serve a
notice of appearance on the attorneys of Plaintiffs within 20 days after the service of this
summons, exclusive of the day of service (or within 30 days after the service is complete
if this summons is not personally delivered to you within the State of New York); and in
case of your failure to appear or answer, judgment will be taken against you by default
for the relief demanded herein.


        Westchester County is designated as the place of trial.  Basis of venue is the
county of the residence of Plaintiffs and occurrence.  Relief sought is monetary damages.


Plaintiffs:  194 Spring Street, 2, Ossining, New York 10562
Phelps Memorial Hospital Center:  701 N. Broadway, Sleepy Hollow, New York 10591
Open Door Family Medical Center, Inc. & Ossining Open Door: 165 Main St. Ossining, NY 10562


Dated:        Yonkers, New York
              November 19, 2007

                                    Fitzgerald & Fitzgerald, P.C.
                                    Attorneys for Plaintiff(s)
                                    By: James P. Fitzgerald, Esq.
                                    538 Riverdale Avenue
                                    Yonkers, New York 10705
                                    Tel: (914) 378-1010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------------------X   Index No.: 23710/06
ROGER STEVEN CARDENAS, an infant, by his mother and
natural guardian, EUDOCIA ANGUISACA, and EUDOCIA
ANGUISACA individually,

                                                        Plaintiff(s),

                    -against-

PHELPS MEMORIAL HOSPITAL CENTER, OPEN DOOR
FAMILY MEDICAL CENTER, INC., and OSSINING OPEN
DOOR,

                                      Defendant(s).
------------------------------------------------------------X
PHELPS MEMORIAL HOSPITAL CENTER,

                                      Third-Party Plaintiff(s),

                    -against-

OPEN DOOR FAMILY MEDICAL CENTER, INC. and
OSSINING OPEN DOOR,

                                      Third-Party Defendant(s).
------------------------------------------------------------X

**VERIFIED
AMENDED
COMPLAINT**

        Plaintiff(s), through the attorneys, Fitzgerald & Fitzgerald, P.C., allege, upon

information and belief, the following:

### THE PARTIES

    1.  Infant Plaintiff, ROGER STEVEN CARDENAS, is an infant, having been born

on August 10, 2005.

    2.  Adult Plaintiff, EUDOCIA ANGUISACA, is an adult over the age of eighteen

(18) and is the parent and natural guardian of Infant Plaintiff.

    3.  Defendant, PHELPS MEMORIAL HOSPITAL CENTER, is a hospital existing

under and by virtue of the laws of the State of New York, with its principal place of

business located at 701 North Broadway, Sleepy Hollow, New York 10591.

4. Defendant, OPEN DOOR FAMILY MEDICAL CENTER, INC., is a family health clinic existing under and by virtue of the laws of the State of New York, with its principal place of business located at 165 Main Street, Ossining, New York 10562.

5. Defendant, OSSINING OPEN DOOR, is a family health clinic existing under and by virtue of the laws of the State of New York, with its principal place of business located at 165 Main Street, Ossining, New York 10562.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR PERSONAL INJURIES

6. Defendants undertook to attend and provide medical care for Plaintiffs in a reasonable, proper, and skillful manner.

7. Defendants and their agents, servants, and/or employees were negligent and committed malpractice in their treatment of Plaintiffs.

8. Plaintiffs sustained severe and permanent injuries as a result of the negligence and malpractice of Defendants.

9. The injuries and damages sustained by Plaintiffs were caused solely by the negligence of Defendants and their agents, servants, and/or employees without any negligence on the part of Plaintiffs contributing thereto.

10. Plaintiffs sustained damages in excess of the jurisdictional limits of all lower courts, which might otherwise have jurisdiction.

## AS AND FOR A SECOND CAUSE OF ACTION
## FOR LACK OF INFORMED CONSENT

11. Defendants and their agents, servants, and/or employees performed some and failed to perform other medical treatments, procedures, surgeries, and/or diagnostic procedures upon Plaintiffs without obtaining the informed consent of Plaintiffs.

12. Defendants and their agents, servants, and/or employees failed to advise Plaintiffs of the risks, dangers, and consequences associated with the performance or non-performance of the aforesaid medical treatments, procedures, surgeries, and/or diagnostic procedures.

13. A reasonably prudent person in the Plaintiffs' position would not have permitted, allowed, or undergone the medical treatments, procedures, surgeries, and/or diagnostic procedures and would have chosen a different course of treatment if he/she had been fully informed of the risks, dangers, and consequences.

14. As a result of the aforesaid medical treatments, procedures, surgeries, and/or diagnostic procedures being withheld or performed upon Infant Plaintiff and mother, without the Plaintiffs' informed consent, Plaintiffs were personally damaged.

15. Such a lack of informed consent is a proximate cause of Plaintiffs' damages for which relief is sought herein.

16. Plaintiffs sustained severe and permanent injuries as a result of Defendants' failure to obtain an informed consent.

17. The injuries and damages sustained by Plaintiffs were caused solely by the negligence of Defendants and their agents, servants, and/or employees without any negligence on the part of Plaintiffs contributing thereto.

18. Plaintiffs sustained damages in excess of the jurisdictional limits of all lower courts, which might otherwise have jurisdiction.

## AS AND FOR A THIRD CAUSE OF ACTION
## ON BEHALF OF ADULT PLAINTIFF
## FOR A DERIVATIVE CLAIM

19. As a result of the injuries sustained by Infant Plaintiff due to the negligence and malpractice of Defendants and their agents, servants, and/or employees, and the lack of informed consent, Adult Plaintiff, parent and natural guardian, incurred expenses and obligations and lost the society and services of Infant Plaintiff.

20. Infant Plaintiff required extraordinary care as a result of Defendants' negligence. Said extraordinary care was provided by Adult Plaintiff. As a result of the necessity of providing said extraordinary care, Adult Plaintiff was damaged by the loss of earnings.

21. Adult Plaintiff is entitled to the fair value of the extraordinary care and for damages sustained in excess of the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

## STATEMENT REGARDING EXCEPTIONS IN CPLR ARTICLE 1602

22. One or more of the exceptions in CPLR § 1602, including but not limited to Subsection 2(iv) and 7 are applicable to all causes of action and Defendants are jointly and severally liable with all other tortfeasors whether parties to this action or not.

WHEREFORE, Plaintiffs demand judgment against Defendants on all causes of action in an amount that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction over this action, together with the interest, costs, and disbursements of same as allowed by law.

Dated:       Yonkers, New York
             November 19, 2007

                              _____
                              Fitzgerald & Fitzgerald, P.C.
                              Attorneys for Plaintiff(s)
                              By: James P. Fitzgerald, Esq.
                              538 Riverdale Avenue
                              Yonkers, New York 10705
                              Tel: (914) 378-1010
                              Fax: (914) 378-1092
                              File No.: A05124

<u>ATTORNEY'S VERIFICATION</u>

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF WESTCHESTER      )

     The undersigned, an attorney duly admitted to practice in the State of New York,

under the penalties of perjury affirms as follows:

   1. I am one of the attorneys for Plaintiffs in this action.

   2. I have read the foregoing Verified Amended Complaint and know the contents

thereof; the same is true to my own knowledge, except as to the matters therein stated to

be alleged on information and belief and, as to those matters, I believe them to be true.

   3. The reason this verification is made by me and not by Plaintiffs is that Plaintiffs

are not presently within the county wherein Plaintiffs' attorneys' offices are located.

   4. The grounds of my belief as to all matters not stated upon my own knowledge are

investigations made and reports of investigation received by me.


Dated:     Yonkers, New York
           November 19, 2007

                                       James P. Fitzgerald, Esq.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------------------X   Index No.: 23710/06
ROGER STEVEN CARDENAS, an infant, by his mother and
natural guardian, EUDOCIA ANGUISACA, and EUDOCIA
ANGUISACA individually,
                                                    Plaintiff(s),

                        -against-

PHELPS MEMORIAL HOSPITAL CENTER, OPEN DOOR          **CERTIFICATE OF**
FAMILY MEDICAL CENTER, INC., and OSSINING OPEN      **MERIT MEDICAL**
DOOR,                                               **MALPRACTICE**
                                                   Defendant(s).
------------------------------------------------------------X
PHELPS MEMORIAL HOSPITAL CENTER,
                                          Third-Party Plaintiff(s),
                        -against-

OPEN DOOR FAMILY MEDICAL CENTER, INC. and
OSSINING OPEN DOOR,
                                          Third-Party Defendant(s).
------------------------------------------------------------X

The undersigned, an attorney duly admitted to practice before the Courts of the

State of New York, hereby affirms the following under the penalties of perjury:

1. I am associated with the firm of Fitzgerald & Fitzgerald, P.C., attorneys for

Plaintiff(s) herein. I am familiar with the facts and circumstances of this proceeding.

This affirmation is made upon information and belief, the source of your affirmant's

knowledge being the file maintained by this office.

2. I have reviewed the facts of the case and have consulted with at least one

physician who is licensed to practice in this state or any other state and who I reasonably

believe is knowledgeable in the relevant issues involved in this action, and I have

concluded on the basis of such review and consultation that there is a reasonable basis for

the commencement of this action.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------------------X    Index No.: 23710/06

ROGER STEVEN CARDENAS, an infant, by his mother and
natural guardian, EUDOCIA ANGUISACA, and EUDOCIA
ANGUISACA individually,

                                                                    Plaintiff(s).

                        -against-

PHELPS MEMORIAL HOSPITAL CENTER, OPEN DOOR
FAMILY MEDICAL CENTER, INC., and OSSINING OPEN
DOOR,

                                                                    Defendant(s).
------------------------------------------------------------X
PHELPS MEMORIAL HOSPITAL CENTER,
                                                    Third-Party Plaintiff(s),

                        -against-

OPEN DOOR FAMILY MEDICAL CENTER, INC. and
OSSINING OPEN DOOR,

                                                    Third-Party Defendant(s).
------------------------------------------------------------X

AMENDED COMPLAINT
VERIFICATION
CERTIFICATE OF MERIT IN MEDICAL MALPRACTICE ACTION

*FITZGERALD & FITZGERALD, P.C.*
*Attorneys for Plaintiff(s)*
*538 Riverdale Avenue*
*Yonkers, New York 10705*
*Tel: (914) 378-1010*
*Fax: (914) 378-1092*
*File No.: A05124*

Certification Pursuant to 22 NYCRR § 130-1.1a(b)

I hereby certify pursuant to 22 NYCRR § 130-1.1a(b) that, to the best of my knowledge, information and
belief, formed after an inquiry reasonable under the circumstances, the presentation of the papers herein or the
contentions therein are not frivolous as defined in 22 NYCRR § 130-1.1(c).

*FITZGERALD & FITZGERALD, P.C.*
*Attorneys for Plaintiff(s)*
By: James P. Fitzgerald, Esq.

# Exhibit D

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: LI YU
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel: (212) 637-2734
Fax: (212) 637-2686
Email: li.yu@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

ROGER STEVEN CARDENAS, an infant, by his   :
Mother and Natural Guardian, EUDOCIA       :
ANGUISACA, and EUDOCIA ANGUISACA,          :
individually,                              :    ECF CASE
                                           :
            Plaintiffs,                    :
                                           :
         against -                         :    07 Civ. 11145 (KMK)(GAY)
                                           :
PHELPS MEMORIAL HOSPITAL CENTER,           :
                                           :
            Defendant.                     :

---------------------------------------------------------------- x

PHELPS MEMORIAL HOSPITAL CENTER,           :    **ANSWER OF THIRD-PARTY**
                                           :    **DEFENDANTS OPEN DOOR**
            Third-Party Plaintiff,         :    **FAMILY MEDICAL CENTER,**
                                           :    **INC. AND OSSINING OPEN**
         against -                         :    **DOOR TO THIRD-PARTY**
                                           :    **COMPLAINT OF PHELPS**
OPEN DOOR FAMILY MEDICAL CENTER, INC.      :    **MEMORIAL HOSPITAL**
and OSSINING OPEN DOOR,                    :    **CENTER**
                                           :
            Third-Party Defendants.        :
                                           :

---------------------------------------------------------------- x

Third-party defendant Open Door Family Medical Center, Inc. and its office in

Ossining, New York, third-party defendant Ossining Open Door, (collectively, "Open

Door"), by and through their attorney, Michael J. Garcia, United States Attorney for the

Southern District of New York, answer the Third-Party Complaint (the "Phelps Third-Party

Complaint") filed against Open Door by Phelps Memorial Hospital Center ("Phelps") in the above-referenced action on information and belief as follows:

1.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Phelps Third-Party Complaint, except admit that Phelps is a hospital located at 701 North Broadway in Sleepy Hollow, New York.

2.    Admit the allegations in paragraph 2 of the Phelps Third-Party Complaint.

3.    Deny allegations in paragraph 3 of the Phelps Third-Party Complaint, except admit that one of the Open Door locations is at 165 Main Street, Ossining, New York 10562.

4.    Admit the allegations in paragraph 4 of the Phelps Third-Party Complaint.

5.    Paragraph 5 of the Phelps Third-Party Complaint consists of Phelps's characterizations of the terms of an agreement between Open Door and Phelps dated September 1, 2003 (the "September 2003 Phelps-Open Door Agreement") to which no response is required; Open Door respectfully refers the Court to the actual terms of that agreement, a copy of which is attached as Exhibit A to this answer. To the extent that a response is required, Open Door deny the allegations in paragraph 5, except admit that Open Door and Phelps had a contract pursuant to which pre-natal care was provided to certain patients in the third trimester of their pregnancy by Open Door employees at Phelps.

6.    Deny the allegations in paragraph 6 of the Phelps Third-Party Complaint, except admit that certain of the patients who received pre-natal care at Open Door during the first two trimesters of their pregnancy pursuant to the September 2003 Phelps-Open Door Agreement were advised that delivery of their infants would be performed at Phelps.

7.    Deny the allegations in paragraph 7 of the Phelps Third-Party Complaint, except admit that Open Door has employed licensed nurse-midwives and that Open Door employees have cared for patients undergoing labor and delivery.

8.      Admit the allegations in paragraph 8 of the Phelps Third-Party Complaint.

9.      Deny the allegations in paragraph 9 of the Phelps Third-Party Complaint, except admit that plaintiff Eudocia Anguisaca ("Anguisaca") was a patient at Open Door in December 2004 and received pre-natal care at that time.

10.     Deny the allegations in paragraph 10 of the Phelps Third-Party Complaint, except admit that Anguisaca received pre-natal care at Open Door from on or about December 2004 until on or about May 2005.

11.     Deny the allegations in paragraph 11 of the Phelps Third-Party Complaint.

12.     Admit the allegations in paragraph 12 of the Phelps Third-Party Complaint.

13.     Deny the allegations in paragraph 11 of the Phelps Third-Party Complaint, except admit that, on August 10, 2005, nurse-midwife Patricia Mahoney was present during the delivery of plaintiff Roger Stevens Cardenas ("Cardenas") and assisted in the delivery of Cardenas.

14.     Admit the allegations in paragraph 14 of the Phelps Third-Party Complaint.

15.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Phelps Third-Party Complaint as to the manner of service upon Phelps; the remaining allegations in paragraph 15 consist of Phelps's characterization of statements in various filings to which no response is required.

16.     Deny the allegations in paragraph 16 in the Phelps Third-Party Complaint, except admit that, on or about August 10, 2005, Patricia Mahoney assisted in the delivery of Cardenas.

17.     Paragraph 17 of the Phelps Third-Party Complaint consists solely of conclusions of law to which no response is required; to the extent that a response is required, deny the allegations in paragraph 17.

The paragraph following "WHEREFORE, the defendant/third-party plaintiff, PHELPS MEMORIAL HOSPITAL CENTER, demands judgment against the third-party defendants" consists solely of Phelps's request for relief to which no response is required. To the extent that a response is required, the Government deny that Phelps is entitled to any of the relief sought.

<center>FIRST DEFENSE</center>

The Phelps Third-Party Complaint fails to state a claim upon which relief can be granted.

<center>SECOND DEFENSE</center>

Neither Open Door nor any of its employees or agents was negligent, at fault or acted with want of due care in regard to the events alleged in the Phelps Third-Party Complaint.

<center>THIRD DEFENSE</center>

The injuries and damages alleged in the Phelps Third-Party Complaint were not proximately caused by a negligent or wrongful act or omission of any of Open Door's employees or agents.

<center>FOURTH DEFENSE</center>

Any injuries or damages alleged in the Phelps Third-Party Complaint were caused in whole or in part to the negligence or other acts of third parties over whom Open Door exercised no control, and any recovery must be proportionately reduced.

<center>FIFTH DEFENSE</center>

Phelps's recovery, if any, is limited by the New York statute governing a claim for contribution, N.Y. CPLR § 1402.

<center>4</center>

<u>SIXTH DEFENSE</u>

Phelps's recovery, if any, is limited by provisions of the Federal Tort Claims Act.

*See* 28 U.S.C. § 2679.

<u>SEVENTH DEFENSE</u>

The Federal Tort Claims Act bars the award of attorney's fees for claims asserted in

the Phelps Third-Party Complaint.  *See* 28 U.S.C. § 2412.

<u>EIGHTH DEFENSE</u>

Open Door asserts that it has, or may have, additional affirmative defenses that are

not known to defendant at this time, but which may be ascertained through discovery. Open

Door specifically preserves these and other defenses as they are ascertained through the

course of discovery.

WHEREFORE, Open Door demands judgment dismissing the Phelps Third-Party

Complaint and granting such further relief as this Court deems proper, including costs and

disbursements.

<div style="margin-left: 40%;">

Dated:  New York, New York
        January 28, 2008
        MICHAEL J. GARCIA
        United States Attorney
        Attorney for Open Door

By:     s/ Li Yu
        LI YU
        Assistant United States Attorney
        Tel.: (212) 637-2734
        Fax: (212) 637-2686
        Email: li.yu@usdoj.gov

</div>

TO:     James P. Fitzgerald, Esq.
        Fitzgerald & Fitzgerald, P.C.
        538 Riverdale Ave.
        Yonkers, NY 10705
        *Counsel for Plaintiffs*

        Rocco Conte, Esq.
        O'Connor, McGuinness, Conte, Doyle & Oleson

One Barker Avenue, Suite 675
White Plains, NY 10601-1517
*Counsel for Defendant and Third-Party Plaintiff Phelps Memorial Hospital Center*

*April 2. 2004*
*CW, MM, SVC Agreement &*
*Binder*

*Charly Denwood*

# AGREEMENT

OPEN DOOR FAMILY MEDICAL CENTER, INC.


And


PHELPS MEMORIAL HOSPITAL CENTER

321270.02

AGREEMENT

AGREEMENT made as of September 1, 2003, between Ossining Open Door Family Medical Center, Inc., a not-for-profit corporation having an address at 165 Main Street, Ossining, New York ("Open Door"), Phelps Memorial Hospital Center a not-for-profit corporation having an address at 701 North Broadway, Sleepy Hollow, New York ("Phelps").

I.  Recitals:  The following recitals are incorporated into this Agreement:

    A.    Phelps owns and operates a not-for-profit hospital at 701 North Broadway, Sleepy Hollow, New York.

    B.    Open Door owns and operates a non-profit Community Health Center at 165 Main St. in Ossining, New York with additional sites in Sleepy Hollow, New York and Port Chester, New York; all references herein to Open Door shall refer to Open Door's Ossining, Port Chester, and Sleepy Hollow locations.

    C.    The parties wish to establish a coordinated delivery system to ensure provider continuity in prenatal care, delivery, and post-natal care in the service areas served by Phelps and Open Door. Further, the parties agree that certain economies of scale may be achieved, if certain aspects of the pre-natal programs run by both Phelps and Open Door are coordinated to provide certain continuity to patients.

    D.    The parties have agreed upon a structure whereby patients seeking pre-natal, delivery, and post-natal services through either Phelps' pre-natal clinic and/or Open Door locations (hereafter "Patients"; the term Patients as used herein shall only include those individuals seeking pre-natal, delivery and postnatal services through either Phelps' pre-natal clinic and/or Open Door, and no other patients) will receive pre-natal care according to an Ossining or Port Chester ambulatory care model. Ossining and Sleepy Hollow patients will receive their ambulatory care through the second trimester of pregnancy at Open Door, and late-term pre-natal care (following the third trimester risk assessment), consisting of approximately the last 4.5 prenatal visits, as well as delivery at Phelps, and then return to Open Door for post-natal care. Port Chester patients will receive all of their ambulatory care at Open Door. Physician and midwife services in the specialty of Obstetrics and Gynecology will be provided through personnel engaged by Open Door at both the Phelps' clinic and Ossining Open Door and Open Door Port Chester/Rye Brook in an effort to provide continuity of care to the Patients.

II.  Patient Services

Ossining patients contacting either the Phelps' clinic or Ossining & Sleepy Hollow Open Door for pre-natal care during the initial two trimesters of pregnancy shall be seen at Open Door. Ossining & Sleepy Hollow Patients seen at Open Door during all or any part of their initial two trimesters of pregnancy as well as Patients contacting either the Phelps' clinic or Open Door for pre-natal or delivery services during the third trimester of their pregnancy shall be seen at Phelps. Patients from Port Chester/Rye Brook shall

2

receive all of their ambulatory care at Open Door. All Patient deliveries will be performed at Phelps. Notwithstanding any of the provisions of this Agreement, Providers shall not refer a Patient to either Open Door or Phelps in accordance with the terms hereof if (i) the Patient expressly requests to receive health care services from another health care provider or (ii) the Provider determines, in his or her professional judgment, that referral to another health care provider is necessary to meet the Patient's medical needs.

A.  Open Door will provide outpatient case management and support services to all Patients at Open Door, including all of the prenatal services mandated under the State Medicaid program referred to as "P-CAP," without exception to all enrollees in the Medicaid program requesting such services. Open Door will also provide post-partum and pediatrics (and maternal post-natal) services to such Patients upon a Patient's request.

B.  Phelps will provide outpatient, case management, and support services to all Patients seen at Phelps, including all of the prenatal services mandated under the P-CAP program, without exception to all enrollees in the Medicaid program requesting such services. The care of Ossining and Sleepy Hollow patients seen at Open Door shall be transferred to the Phelps' clinic once the third trimester risk assessment has been completed at Open Door (or at a otherwise mutually agreed upon time, based upon the needs of the particular Patient). Phelps will also provide all delivery and in-patient services for the Patients and their infants, including newborn assessments. Services to high-risk Patients shall be provided in accordance with Phelps' existing protocols, where appropriate, high-risk Patients will be transferred to appropriate facilities.

C.  Open Door shall cause its physicians (each a "Physician") and midwives (each a "Midwife") to provide prenatal services at Ossining Open Door, Port Chester/Rye Brook Open Door and the Phelps' clinic (the Physicians and Midwives are collectively referred to herein as "Providers"). All deliveries and hospital based gynecology procedures will be performed at Phelps by Open Door providers unless patients are considered to be high risk or the patient requests a different location. Outpatient gynecology services will also be provided by Open Door [Providers/Physicians] at Open Door.

III.  Services at Open Door

A.  Patient Care Services. "Subject to any limitations set forth in this Agreement, Open Door shall cause the Providers it employs or otherwise retains to provide Patient care services at either Open Door or Phelps in accordance with the terms of Section II hereof." Open Door shall, and shall cause each individual Provider to, provide such services in accordance with the terms of this Agreement. All deliveries performed in connection with Patients seen at Phelps and/or Open Door shall be performed at Phelps, except as set forth under Section II. above. Open Door and Phelps shall provide or arrange for the provision of non-emergent ultrasound services to Patients covered hereunder as described in Schedule C.

3

Open Door shall provide 24 X 7 (i) Midwife coverage to Phelps labor and delivery suite, and (ii) on-call Physician back-up coverage for the Midwives. The Midwives shall also be available to cover non-Open Door hospitalized patients if necessary.

B.    <u>Hours</u>. During the term of this Agreement, Open Door shall cause its Providers to provide such services as are necessary to fulfill its duties as set forth herein, as directed by Phelps from time to time. Open Door shall provide (i) administrative and supervisory services (as required herein) at Phelps and Open Door during normal working hours as requested by Phelps, and (ii) Provider services, in the specialty of Obstetrics and Gynecology, to Patients at Phelps and Open Door in accordance with this Agreement. The specific hours to be provided by the Providers shall be based upon the requirements of the Department of Obstetrics and Gynecology (the "Department") and Open Door, determined by Phelps in consultation with Open Door and shall initially include the hours set forth on Schedules A (with respect to Phelps) and B (with respect to Open Door), such Schedules shall be subject to modification by (i) Phelps with respect to Schedule A, and (ii) Open Door, with respect to Schedule B. Open Door shall, on or before the 1st of each month, provide Phelps with a written monthly schedule for Physician and Midwife services including, on-call coverage at Phelps. Such Schedules shall be subject to the approval of Phelps which approval shall not be unreasonably withheld or delayed.

IV.   <u>Services at Phelps</u>

In addition to providing patient care services at Phelps, Open Door and each of the Physicians providing services on behalf of Open Door shall be responsible to assist Phelps' Director of Obstetrics & Gynecology ("OB/GYN") in the operation of the Department including:

A.    Assisting in the implementation of policies, procedures and methods of operation, complying with and enforcing the bylaws, rules and regulations of the Hospital and its medical staff, as well as the Standards set forth by the Joint Commission on Accreditation of Health-Care Organizations, the American Medical Association, and the American Hospital Association, all as they apply to the Department.

B.    Assisting, within the Department, in the compliance with all applicable Federal, state and local laws, ordinances, rules and regulations, and policies and procedures established by all governmental agencies including, without limitation, all standards of care as specified under the P-CAP Program.

C.    Providing clinic coverage in the Department as provided in Schedule A or as otherwise mutually agreed from time to time. Providing 24 hour (365 day) on-call services, with respect to its duties hereunder.

4

D.   Cooperating with the Hospital regarding the utilization review, quality assurance and medical audit process of the Department and maintaining the activities of the Department consistent with the recommendations established by these processes.

E.   Assisting the Hospital as reasonably requested in the administration of the Department.

V.   Administrative & Supervisory Services provided by Phelps

A.   Maintain case management and support services for pre-natal Patients once the Patient is transferred to Phelps, as well as compliance with all of the requirements of the New York State P-CAP program.

B.   Maintain a trained and effective support staff for the program with such services as are mandated by State and Federal laws.

C.   Maintain communication with Open Door regarding the progress of Patients during gestation and supply Open Door with birthing information as agreed upon (within 48 hours of delivery), and promptly transfer to Open Door all Patient medical records and other information necessary for Open Door to provide treatment to Patients.

D.   Provide prenatal billing services for all visits (other than deliveries) which occur at Phelps.

E.   Coordinate credentialing of OB staff with Director of Personnel at Open Door.

F.   Maintain adequate facilities for the provision of all services covered by this Agreement, including pre-natal visits and deliveries.

VI.   Administration & Supervisory Services provided by Open Door

A.   Maintain case management and support services for pre-natal Patients until such time as the Patient is transferred to Phelps; as well as compliance with the requirements of the New York State P-CAP program.

B.   Maintain a trained and effective support staff for the program with such services as are mandated by State and Federal laws.

C.   Provide facilities which are dedicated to the program at Sleepy Hollow, Port Chester, and Ossining.

D.   Provide full time case managers who will be responsible for Patient compliance and follow-up within P-CAP standards.

E.   Provide pre-natal billing services for all visits at Open Door and billing for in-patient services performed by the midwives, OB/GYN and covering providers.

5

F.   Promptly transfer records to Phelps with complete information on pre-natal service and medical findings. Maintain communications with Phelps with respect to all program participants.

G.   Provide outreach services to insure that community residents are knowledgeable about the program emphasizing the importance of first trimester enrollment.

## VII. Compensation/Billing

A.   Phelps.  During the initial year of this Agreement, Phelps shall pay Open Door (subject to adjustment as provided below) Two Hundred Eighty Seven Thousand Five Hundred Dollars in year one and Three Hundred Thousand Dollars in year two, which shall be payable in twelve (12) monthly installments commencing with September 1, 2003 as discussed in Schedule D and continuing on the first day of each calendar month thereafter.  The parties agree that the compensation provided for under this Agreement is consistent with the fair market value of the services rendered hereunder.

B.   Open Door shall be responsible for all compensation due to Providers for services rendered under this Agreement.  In no event shall any Provider have the right to seek any compensation, fringe benefits or other remuneration from Phelps for such services.

   i.   Subject to paragraph (ii) below, all hospital and ambulatory services provided hereunder by Phelps shall be billed and collected by Phelps.  At Open Door's option, all billing and collection with respect to professional fees relating to services rendered by Providers under this Agreement at either Open Door or Phelps shall be carried out in (a) the name and billing number of the individual Provider, (b) the name and billing number of Open Door, or (c) any other legally permissible group name and billing number designated by Open Door.  All billing and collections for professional fees shall be performed by Open Door either directly or utilizing such contractors or subcontractors as Open Door may determine in its sole discretion.  In the event either party or any Provider is erroneously reimbursed directly or otherwise receives payment for services at Phelps or Open Door to which such party or Provider is not entitled under the terms of this Agreement, the party or Provider receiving such payment shall promptly deliver such payment to Phelps or Open Door.  Phelps hereby agrees and shall cause each Provider to agree to execute such additional documentation as may be necessary, in the opinion of Phelps and/or its counsel, to effectuate or evidence such assignment.

   ii.  At Phelps's option, all billing and collection with respect to all hospital services, shall be carried out in Phelps' institutional billing numbers. All hospital billing and collections shall be performed by Phelps either

6

directly or utilizing such contractors or subcontractors as Phelps may determine in its sole discretion.

C.    It is expressly acknowledged by the parties hereto that Open Door Providers are "independent contractors" of Phelps, and nothing in this Agreement is intended or shall be construed to create with Phelps an employer/employee relationship or a joint venture relationship or to permit Open Door or any Provider to incur any obligation or enter into any agreement on behalf of Phelps, provided that the services to be provided hereunder by Open Door and each Provider at Phelps shall be provided in a manner consistent with Provider standards governing such services, the By-laws, rules and regulations of Phelps and its Medical Staff and the provisions of this Agreement. Open Door and each Provider understands and agrees that Phelps will not withhold on behalf of Open Door or such Provider any sums (or make any payments) for income tax, unemployment insurance, social security, or any other withholding pursuant to any law or requirement of any governmental body relating to Open Door or the Provider, or make available to Open Door or the Provider any of the benefits afforded to employees of Phelps and that all of such payments, withholdings, and benefits, if any, are the sole responsibility of Open Door and the Provider. In the event the Internal Revenue Service or any other governmental agency should question or challenge the independent contractor status of Open Door or any Provider, Phelps shall have the right to participate in any discussion or negotiation occurring with such agency or agencies, irrespective of whom or by whom such discussion or negotiation is initiated. Open Door and each Provider hereby jointly and severally indemnify and hold Phelps, its members, trustees, officers and employees harmless against any and all claims, costs and damages asserted against, incurred or required to be paid by any such person arising from a breach of Open Door's or such Provider's obligations under this section. This section shall survive termination of this agreement.

VIII.  Providers

A.    Qualifications. As a continuing condition precedent to all parties obligations under this Agreement and prior to the provision of any services by any Physician hereunder, such Physician shall: (i) hold a currently valid and unlimited license and registration to practice medicine in the State of New York; (ii) be board certified or board eligible in Obstetrics and/or Gynecology and hold and maintain in good standing, membership on Phelps' Medical Staff with appropriate privileges, in accordance with Phelps' policies and be credentialed to provide services at Open Door in accordance with Open Door's policies; (iv) hold and maintain a currently valid Drug Enforcement Agency (DEA) certification; and (v) be a Provider under the Medicare and Medicaid Programs. All midwives shall be certified in accordance with New York law and shall maintain appointments at Phelps and Open Door in accordance with the rules and regulations of Phelps and Open Door, respectively, regarding such appointments. Proof of such licensure and accreditation will be supplied to Phelps and Open Door. The health status of all Providers must be submitted to Phelps and Open Door as outlined in

7

NYSDOH standards.  Written verification of the above shall be submitted to the human resource department of Phelps by Open Door.

B.   Representatives.  Phelps and Open Door shall each designate an individual to serve as liaison between the parties for purposes of implementing each parties duties hereunder.

C.   Malpractice Insurance.  Through the term of this Agreement, Open Door shall maintain and shall maintain or cause each Provider providing services hereunder to maintain medical malpractice insurance, on an occurrence basis, in the minimum amounts required for all members of the Medical Staff of Phelps through such insurance carrier(s) selected by Open Door and approved by Phelps (provided Phelps shall not unreasonably withhold such approval), and shall provide Phelps with evidence of same upon request.  Coverage available to Open Door and Providers under the Federal Tort Claims Act shall satisfy Open Door's obligations under this section.

D.   Incident Reporting.  In the event any provider is involved in any situation which requires a report pursuant Public Health Law 2805-I (Incident Reporting) all parties shall be advised of the nature of the situation giving rise to the report and the Parties shall discuss the potential impact of the situation, if any, including but not limited to the appropriate corrective action.

IX.   Term of Agreement

A.   Term.  The initial term of this Agreement shall be two (2)years, unless otherwise terminated as herein provided.  Any party may terminate this Agreement at any time, with or without cause, upon ninety (90) days written notice to the other Parties.

B.   This Agreement may be terminated at any time by written mutual agreement.

C.   The right of any Provider to provide services hereunder may be terminated immediately without prior written notice at any time by Phelps for just cause, which may include, but need not be limited to any one or more of the following:

(i).   A suspension, limitation, or revocation to a Physician's license to practice medicine in the State of New York which is not stayed within ten (10) days of such suspension, limitation or revocation.

(ii).   A termination, suspension, or non-renewal of a Physician's medical staff privileges (a) at Phelps in accordance with the medical staff bylaws, rules and regulations and policies of Phelps or (b) at Open Door, in accordance with its bylaws, rules and regulations.

(iii).   A Physician's failure or inability to qualify for Provider liability insurance coverage.

8

(iv). Termination or suspension of a Physician's certification by such Physician's specialty Board.

(v). Termination or suspension of a Physician's status as a Medicare or Medicaid Provider.

(vi). Termination, suspension, or revocation of a Physician's DEA number.

(vii). A Physician's death or disability. Disability shall be defined as such Physician's inability to carry out such Physician's obligations under this Agreement for a consecutive period in excess of ninety (90) consecutive days or any one hundred and twenty (120) or more days during any 365 day period.

(viii). Other conduct which in the fair and reasonable opinion of the Chief Executive Officer (or designee) of Phelps is such as to create a threat to the health, safety or welfare of patients, demonstrates a failure to carry out Open Door's Provider responsibilities hereunder, or is otherwise contrary to the best interest and welfare of the Hospital and its patients.

Upon any such termination, Open Door shall promptly provide a replacement provider, who meets the requirements set forth above and is reasonably acceptable to Phelps.

D. At Phelps' option and in accordance with Phelps' Policies, Phelps may suspend any Provider from the provision of services hereunder during the pendency of any corrective action initiated pursuant to the Medical Staff Bylaws. In the event that such corrective action includes a summary suspension of Medical Staff privileges, Phelps may suspend any and all of such Provider's services hereunder without compensation for the suspension period (in the sole discretion of Phelps). Should the Board fail to sustain the summary suspension of Medical Staff privileges, such Provider may resume his obligations under this Agreement.

E. In the event that any party shall give notice to any other party (such notice shall be sent to all parties) that it has defaulted substantially in the performance of any obligation under this Agreement and such default has not been cured to the reasonable satisfaction of the non-defaulting parties within thirty (30) days, following the giving of such notice, the non-defaulting parties (or any one of them) shall have the right to terminate this Agreement as of the end of such notice period.

F. In the event that there is a change in the Medicare or Medicaid Acts, regulations, or general instructions (or in the application thereof), the adoption of new legislation, or a change in any other third party payor reimbursement system, any of which materially affects the reimbursement which Open Door or Phelps may receive for its or their respective services furnished to Patients, such party may by notice propose a new basis for compensation for the services furnished pursuant to this Agreement. If such notice of new basis is given and if the parties, using their best efforts and acting in good faith, are unable within one hundred and twenty

9

(120) days thereafter to agree upon a new basis for compensation, any party may terminate this Agreement by thirty (30) days prior notice to the others on any future date specified in such notice. In addition, Phelps may terminate this Agreement upon thirty (30) days prior written notice to Open Door in the event the Department or the Department is decertified, voluntarily or involuntarily.

G..      In the event either party loses its license, certification or accreditation to provide the services covered by this Agreement, the other party shall have the right to immediately terminate this Agreement on notice to such party.

Upon termination of this Agreement, Open Door shall be entitled to receive the accrued but unpaid compensation owed by Phelps and shall not be entitled to any additional compensation hereunder or otherwise.

X.   Miscellaneous.

A.      Notwithstanding any other provisions in this Agreement, Open Door shall remain responsible for insuring that all services provided hereunder at locations operated by them shall comply with all applicable federal, state and local laws, ordinances, rules, regulations and policies and procedures assuring that they are consistent with the requirements of Provider standards established by all relevant certifying or accrediting entities.

B.      Notwithstanding any other provisions in this Agreement, Phelps shall remain responsible for insuring that all services provided hereunder at locations operated by them shall comply with all applicable federal, state and local laws, ordinances, rules, regulations and policies and procedures assuring that they are consistent with the requirements of Provider standards established by all relevant certifying or accrediting entities.

C.      This agreement is made in the State of New York and shall be interpreted, construed and governed by the laws of New York State without giving effect to the rules of conduct law.

D.      No assignment or subcontract of this Agreement, or the rights or obligations hereunder shall be valid without the prior written consent of all parties. With approval from Phelps, which shall not be unreasonably withheld, nothing in this section shall be construed as prohibiting or restricting Open Door from contracting with professional corporations, medical groups or other entities, including, without limitation, Sleepy Hollow Medical Group, P.C., for the services of Providers with privileges at Phelps rendering treatment under this Agreement.

E.      This Agreement may only be amended by a written instrument executed by all parties hereto.

321270.02

IN WITNESS WHEREOF, the Parties hereto have executed this agreement as of the date first written above.

OPEN DOOR FAMILY MEDICAL CENTER INC.

By _____
Lindsay Farrell, President & CEO


PHELPS MEMORIAL HOSPITAL CENTER

By _____
Keith F. Safian, President & CEO

11

Schedule A & B

# SLEEPY HOLLOW MEDICAL GROUP, PC
## MARCH 2004
## HOSPITAL ON-CALL SCHEDULE

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| NICOLE STEGMAN 29 | SABINA DISTEFANO MD 1 | INGRID DELER-GARCIA CRNA / NICOLE STEGMAN MD 2 | LAWRENCE MENDELOWITZ MD 3 | MARK MENDELOWITZ MD 4 | SABINA DISTEFANO MD 5 | LAWRENCE MENDELOWITZ MD 6 |
| LAWRENCE MENDELOWITZ MD 7 | SABINA DISTEFANO MD 8 | INGRID DELER-GARCIA CRNA / LAWRENCE MENDELOWITZ MD 9 | DOMINIC ARIG MB 10 | NICOLE STEGMAN MD 11 | LAWRENCE MENDELOWITZ MD 12 | INGRID DELER-GARCIA CRNA / MARIE MENDELOWITZ MD 13 |
| DOMINIC ARIG MD 14 | SABINA DISTEFANO MD 15 | LAWRENCE MENDELOWITZ MD 16 | DOMINIC ARIG MD 17 | NICOLE STEGMAN MD 18 | MARK MENDELOWITZ MD 19 | SABINA DISTEFANO MD 20 |
| SABINA DISTEFANO MD 21 | NICOLE STEGMAN MD 22 | LAWRENCE MENDELOWITZ MD 23 | MARK MENDELOWITZ MD 24 | SABINA DISTEFANO MD 25 | NICOLE STEGMAN MD 26 | INGRID DELER-GARCIA / LAWRENCE MENDELOWITZ MD 27 |
| LAWRENCE MENDELOWITZ MD 28 | SABINA DISTEFANO MD 29 | INGRID DELER-GARCIA CRNA / NICOLE STEGMAN MD 30 | LAWRENCE MENDELOWITZ MD 31 | | | |

SCHEDU 1 & B

## March 2004

### 1st Call Midwives-Woman's Health/OB

updated 1/30/04

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Lisha Coster 914-264-0936 | Patti Mahoney 914-264-0503 | Laura Cross 914-264-0676 | Sheila Townsend 914-264-0863 | Christina Mannion 914-264-0941 | | |
| | **1** Patti D/N — Sheila -OOD | **2** Patti D, Laura-N — Sheila -RB | **3** Laura-D/N — Chris-RB | **4** Sheila D/N — Chris-RB | **5** Lisha-D/N — Laura -OOD | **6** Chris-24 Hrs |
| **7** Lisha 24 Hrs | **8** Laura-D/N — Patti-V Sheila -OOD | **9** Lisha D/N — Patti-V Sheila -RB | **10** Laura D/N — Patti-V Chris-RB | **11** Sheila D/N — Patti-V Chris-RB | **12** Chris-D/N — Patti-V Laura-OOD | **13** Lisha-24 Hrs Patti-V |
| **14** Patti-V Chris-D Lisha-N | **15** Sheila-D/N | **16** Sheila-D Laura-N | **17** Patti- D/N | **18** Laura-D/N | **19** Lisha-D/N | **20** Lisha-24 Hrs |
| | Chris -OOD | Laura -RB | Sheila -RB | Chris-RB | Patti-OOD | Lisha-24 Hrs |
| **21** Chris 24 Hrs | **22** Laura-N Patti –D Sheila-V Patti-OOD | **23** Patti-D Laura-D Sheila-V Chris-RB | **24** Patti- N/D Sheila-V Christine -RB | **25** Laura-D/N Sheila-V Lisha-RB | **26** Laura-D Lisha –N Sheila-V Chris -OOD | **27** Lisha -24 Hrs Sheila-V |
| **28** Chris-24 Hrs Sheila-V | | | | | | |

**SCHEDULE C**

**NYS MEDICAID FEE SCHEDULE**

<u>**CODES**</u>
76800
76805
76815
76816
76818
76825
76830
76855
76756
7857

SCHEDULE D
## Phelps-Open Door Payment Schedule

**Payment Schedule Year One**

| | | |
|---|---|---|
| September 2003 | | 30,000 |
| October 2003 | | 30,000 |
| November 2003 | | 30,000 |
| December 2003 | | 21,944.00 |
| Janaury 2004 | | 21,944.00 |
| February 2004 | | 21,944.00 |
| March 2004 | | 21,944.00 |
| April 2004 | | 21,944.00 |
| May 2004 | | 21,944.00 |
| June 2004 | | 21,944.00 |
| July 2004 | | 21,944.00 |
| August 2004 | | 21,944.00 |
| | Total | 287,496 |

**Payment Schedule Year Two**

| | | |
|---|---|---|
| September 2004 | | 25,000.00 |
| October 2004 | | 25,000.00 |
| November 2004 | | 25,000.00 |
| December 2004 | | 25,000.00 |
| Janaury 2005 | | 25,000.00 |
| February 2005 | | 25,000.00 |
| March 2005 | | 25,000.00 |
| April 2005 | | 25,000.00 |
| May 2005 | | 25,000.00 |
| June 2005 | | 25,000.00 |
| July 2005 | | 25,000.00 |
| August 2005 | | 25,000.00 |
| | Total | 300,000.00 |

**PHELPS MEMORIAL HOSPITAL CENTER**

**HIPAA BUSINESS ASSOCIATE ADDENDUM
(INCLUDING ELECTRONIC TRANSACTION STANDARDS)**

This Addendum, dated as of September 1, 2003 ("Addendum"), supplements and is made a part of the Services Agreement (as defined below) by and between Phelps Memorial Hospital Center ("Covered Entity") and Open Door Family Medical Center, Inc. ("Business Associate").

WHEREAS, Covered Entity and Business Associate are parties to the Service Agreement pursuant to which Business Associate provides certain services to Covered Entity. In connection with Business Associate's services, Business Associate creates or receives Protected Health Information from or on behalf of Covered Entity, which information is subject to protection under the Federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 ("HIPAA") and related regulations promulgated by the Secretary ("HIPAA Regulations").

WHEREAS, in light of the foregoing and the requirements of the HIPAA Regulations, Business Associate and Covered Entity agree to be bound by the following terms and conditions:

1.     **Definitions.**

(a)     General. Terms used, but not otherwise defined, in this Addendum shall have the same meaning as those terms in the Privacy Rule.

(b)     Specific.

(i)     Individual. "Individual" shall have the same meaning as the term "individual" in 45 CFR 164.501 and shall include a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g).

(ii)     Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR part 160 and part 164, subparts A and E.

(iii)     Protected Health Information. "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR 164.501, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

(iv)     Required By Law. "Required by Law" shall have the same meaning as the term "required by law" in 45 CFR 164.501.

(v)     Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

1

(vi)    Services Agreement.    "Services Agreement" shall mean any present or future agreements, either written or oral, between Covered Entity and Business Associate under which Business Associate provides services to Covered Entity which involve the use or disclosure of Protected Health Information.

2.      **Obligations and Activities of Business Associate.**

(a)    Use and Disclosure. Business Associate agrees to not use or disclose Protected Health Information other than as permitted or required by the Services Agreement or as Required By Law.

(b)    Appropriate Safeguards. Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by the Services Agreement.   Without limiting the generality of the foregoing, Business Associate agrees to protect the integrity and confidentiality of any Protected Health Information it electronically exchanges with Covered Entity.

(c)    Mitigation.    Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Addendum.

(d)    Reporting. Business Associate agrees to report to Covered Entity any use or disclosure of the Protected Health Information not provided for by the Services Agreement of which it becomes aware.

(e)    Agents. Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through this Addendum to Business Associate with respect to such information.

(f)    Access to Designated Record Sets. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner designated by the Covered Entity, to Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR 164.524.

(g)    Amendments to Designated Record Sets. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR 164.526 at the request of Covered Entity or an Individual, and in the time and manner designated by the Covered Entity.

(h)    Access to Books and Records. Business Associate agrees to make internal practices, books, and records, including policies and procedures and Protected Health

2

Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary, in a time and manner designated by the Covered Entity or designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

      (i)      <u>Accountings</u>. Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

      (j)      <u>Requests for Accountings</u>. Business Associate agrees to provide to Covered Entity or an Individual, in the time and manner designated by the Covered Entity, information collected in accordance with Section 2.i. of this Addendum, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

3.      <u>**Permitted Uses and Disclosures by Business Associate.**</u>

      (a)      <u>Services Agreement</u>.  Except as otherwise limited in this Addendum, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the Services Agreement, provided that such use or disclosure would not violate the Privacy Rule if done by Covered Entity or the minimum necessary policies and procedures of the Covered Entity.

      (b)      <u>Use for Administration of Business Associate</u>. Except as otherwise limited in this Addendum, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

      (c)      <u>Disclosure for Administration of Business Associate</u>. Except as otherwise limited in this Addendum, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that disclosures are Required by Law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

3

4.   **Permissible Requests by Covered Entity.** Except as set forth in Section 3 of this Addendum, Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by Covered Entity.

5.   **Term and Termination.**

(a)   Term. This Addendum shall be effective as of the date of this Addendum, and shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

(b)   Termination for Cause. Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity shall either:

(i)   Provide an opportunity for Business Associate to cure the breach or end the violation. If Business Associate does not cure the breach or end the violation within the time specified by Covered Entity, Covered Entity shall terminate: (A) this Addendum; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected Health Information; and (C) such other provisions, if any, of the Services Agreement as Covered Entity designates in its sole discretion;

(ii)   Immediately terminate: (A) this Addendum; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected Health Information; and (C) such other provisions, if any, of the Services Agreement as Covered Entity designates in its sole discretion if Business Associate has breached a material term of this Addendum and cure is not possible; or

(iii)   If neither termination nor cure are feasible, Covered Entity shall report the violation to the Secretary.

(c)   Effect of Termination.

(i)   Except as provided in paragraph ii. of this Section 5.c., upon termination of this Addendum, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

(ii)   In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of this Addendum to such Protected Health Information and limit further uses and disclosures of

4

such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

6.  **Electronic Transaction Standards**.

(a)  <u>Compliance with HIPAA Standards</u>.  When providing its services and/or products, Business Associate shall comply with all applicable HIPAA standards and requirements (including, without limitation, those specified in 45 CFR Part 162) with respect to the transmission of health information in electronic form in connection with any transaction for which the Secretary has adopted a standard under HIPAA ("Covered Transactions").  Business Associate will make its services and/or products compliant with HIPAA's standards and requirements no less than thirty (30) days prior to the applicable compliance dates under HIPAA.  Business Associate represents and warrants that it is aware of all current HIPAA standards and requirements regarding Covered Transactions, and Business Associate shall comply with any modifications to HIPAA standards and requirements which become effective from time to time.  Business Associate agrees that such compliance shall be at its sole cost and expense, which expense shall not be passed on to Covered Entity in any form, including, but not limited to, increased fees.

(b)  <u>Agents and Subcontractors</u>.  Business Associate shall require all of its agents and subcontractors (if any) who assist Business Associate in providing its services and/or products to comply with all applicable requirements of HIPAA, including without limitation, compliance with 45 CFR Part 162.

7.  **Miscellaneous**.

(a)  <u>Regulatory References</u>.  A reference in this Addendum to a section in the Privacy Rule means the section as in effect or as amended.

(b)  <u>Amendment</u>.  The Parties agree to take such action as is necessary to amend the Services Agreement from time to time as is necessary for Covered Entity to comply with the requirements of the Privacy Rule and HIPAA.

(c)  <u>Survival</u>.  The respective rights and obligations of Business Associate under Section 5.c. of this Addendum shall survive the termination of the Services Agreement.

(d)  <u>Interpretation</u>.  Any ambiguity in this Addendum shall be resolved to permit Covered Entity to comply with the Privacy Rule.

(e)  <u>Miscellaneous</u>.  The terms of this Addendum are hereby incorporated into the Services Agreement.  Except as otherwise set forth in Section 7.d. of this Addendum, in the event of a conflict between the terms of this Addendum and the terms of the Services Agreement, the terms of this Addendum shall prevail.  The terms of the Agreement which are not modified by this Addendum shall remain in full force and effect in accordance with the terms thereof.  The Services Agreement together with this Addendum constitutes the entire agreement between the parties with respect to the

5

subject matter contained herein. This Addendum may be executed in counterparts, each of which when taken together shall constitute one original.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the date set forth above.

**PHELPS MEMORIAL HOSPITAL CENTER**

By: _____

Name: Kerry L. Pisano

Title: VP, Support Services & Privacy Officer

**OPEN DOOR FAMILY MEDICAL CENTER, INC.**

By: _____

Name:

Title:

6

# Exhibit E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------X     Index No.: 23710/06

ROGER STEVEN CARDENAS, an infant, by his mother
and natural guardian, EUDOCIA ANGUISACA, and     **PLAINTIFFS'**
EUDOCIA ANGUISACA, individually,     **VERIFIED BILL**
                                        Plaintiffs,     **OF PARTICULARS**

                    -against-

PHELPS MEMORIAL HOSPITAL CENTER,
                                        Defendant.
-------------------------------------------------------------X

        Plaintiffs, by their attorneys, Fitzgerald & Fitzgerald, P.C., as and for their

Verified Bill of Particulars in response to the demand of defendant Phelps Memorial

Hospital Center, hereinafter "Defendant", set forth as follows, upon information and

belief:

**DEMAND No. 1:**     State the present post office address and residence of the plaintiffs
herein.

**RESPONSE No. 1:**     The present post office address and residence of Plaintiffs is 194

Spring Street – Apt. 2 [P.O. Box 1744]; Ossining, NY 10562.

**DEMAND No. 2:**     Set forth the dates of hospital confinement.

**RESPONSE No. 2:**     Defendant by and through its agents, servants, and employees,

actual and/or ostensible, departed from standards of good and accepted medical practice

and was negligent, actually and proximately causing personal injury and economic

damages to Plaintiffs, in the medical care rendered to Adult Plaintiff and Infant Plaintiff

at the time Defendant undertook to attend and provide prenatal/obstetrical medical care

for Adult Plaintiff beginning on August 9, 2005; and undertook to attend and provide

medical care for Infant Plaintiff, beginning at Infant Plaintiff's birth on August 10, 2005

and continuing until Infant Plaintiff's discharge on August 12, 2005.

**DEMAND No. 3:**    Set forth the exact days and the approximate hours on such days when it is claimed the occurrences in the complaint took place.

**RESPONSE No. 3:**  Defendant by and through its agents, servants, and employees, actual and/or ostensible, departed from standards of good and accepted medical practice and was negligent, actually and proximately causing personal injury and economic damages to Plaintiffs, in the medical care rendered to Adult Plaintiff and Infant Plaintiff at the time Defendant undertook to attend and provide prenatal/obstetrical medical care for Adult Plaintiff beginning on August 9, 2005; and undertook to attend and provide medical care for Infant Plaintiff, beginning at Infant Plaintiff's birth on August 10, 2005 and continuing until Infant Plaintiff's discharge on August 12, 2005. Defendant's aforementioned malpractice and negligence was ongoing and cumulative. The times of such acts are better known to Defendant and are reflected in the medical records maintained by Defendant if such times were noted.

**DEMAND No. 4:**    Set forth in sufficient detail so that the same can be identified, the location of the occurrence referred to in the complaint.

**RESPONSE No. 4:**  Infant Plaintiff was born at Phelps Memorial Hospital Center located at 701 North Broadway; Sleepy Hollow, NY 10591.

**DEMAND No. 5:**    State the acts of commission and omission constituting the alleged negligence on the part of the hospital.

**RESPONSE No. 5:**  Defendant departed from good and accepted medical care to Plaintiffs by the following:

<u>Inadequate Staffing Departures</u>

failure to properly screen, hire, train, monitor, instruct, and supervise the agents, employees, residents, nurses, and private attendings who treated Plaintiffs while in the hospital; failure to provide qualified, experienced, and trained personnel to care for

Plaintiffs while in the hospital; failure to have appropriate equipment and at all times immediately available in the room where Plaintiffs were being treated; failure to properly maintain and preserve the medical records of Plaintiffs; failure to promulgate and enforce rules, regulations, and protocols governing the specialties of medical care provided to and required by Plaintiffs; and holding nurses out as obstetricians.

### Antenatal and Labor and Delivery Admission Departures

failure to treat the pregnancy as a high risk pregnancy; failure to monitor the pregnancy with more frequent antenatal visits; failure to perform sonograms at appropriate times; failure to do serial sonograms; failure to take a proper medical and obstetrical history; failure to consider the significance of the signs, symptoms, and complications in the mother's medical and obstetrical history; failure to monitor the fetus' growth and well being; failure to monitor utero placental sufficiency; failure to diagnose and treat mother for infectious diseases which put the fetus and newborn at risk; failure to prescribe and administer antimicrobial and antiviral medication at appropriate times; failure to perform appropriate differential diagnoses; failure to order bed rest at appropriate times; failure to do C.B.C.s at appropriate times; failure to admit the mother for close observation of both the mother and fetus; failure to assess maternal weight gain, protein in urine, and edema at appropriate times; failure to take vital signs, including temperature and blood pressure at appropriate times and failure to appreciate the significance of vital signs; failure to develop a management plan for the timing and mode of delivery given the mother's prior obstetrical history, clinical signs, and symptoms during this pregnancy; failure to perform non-stress tests at appropriate times; failure to do biophysical profiles at appropriate times; and failure to make adequate and proper consultations at timely and sufficient

intervals with other doctors and specialists, including but not limited to maternal fetal

medical specialists, neonatologists, radiologists/sonographers, anesthesiologists,

infectious disease experts, cardiologists, pulmonologists, and neurologists.

## Additional Labor and Delivery Admission Departures

failure to recognize and manage the signs and symptoms of fetal distress; failure to

determine the etiology of fetal distress with an appropriate differential diagnosis; failure

to promptly and properly monitor the well being of the fetus with electronic fetal

monitoring; failure to continuously monitor by the fetal heart with electronic means

during the entire labor and up until the time of delivery; failure to recognize and

appreciate the significance of early, late, and variable decelerations, loss of beat-to-beat

variability, bradycardia, tachycardia, and accelerations; failure to observe and appreciate

the significance of the contractions during labor; failure to perform N.S.T.s and

biophysical profiles at appropriate times; failure to consider and perform fetal scalp

sampling; failure to do sonography during labor in order to assess the position and well

being of the fetus, the positioning of the umbilical cord, and the feto-pelvic relationships

and proportions; failure to observe the fetal monitoring strips continuously and make

appropriate notations on a regular basis as to the observations made; failure to assess the

utero placental sufficiency; failure to assess the position of the umbilical cord and cord

compression; failure to monitor the progress of labor and determine by differential

diagnosis the cause of delays and arrests; failure to observe and appreciate the

significance of the rates of dilatation and descent; failure to determine by differential

diagnosis the etiology of dilatation and descent that were not within normal limits; failure

to do pelvimetry; failure to accurately estimate fetal size and position; failure to assess

amniotic fluid volume and consider the prescription and administration of amnio infusion; failure to observe that the fetus was at risk for or suffering from hypoxia ischemia; failure to diagnose fetal hypoxia ischemia; failure to administer in utero resuscitation; failure to reposition mother and fetus and to provide oxygen therapy to mother and fetus at appropriate times; failure to properly use instruments during delivery; failure to prevent injury from trauma during labor and delivery; failure of not performing maneuvers in a prompt and timely manner; failure to notify pediatric department in a timely manner to be present at delivery; failure to observe and diagnose meconium passage in a timely manner; failure to assess the significance of meconium passage; failure to prevent meconium aspiration; the use of Pitocin when contraindicated; the use of Pitocin in improper dosages; failure to order preparation for Cesarean section in a timely manner, including the notifying of the medical team members whose attendance was necessary and the preparation of the mother for Cesarean section delivery; failure to do a timely Cesarean section; and failure to make adequate and proper consultations at timely and sufficient intervals with other doctors and specialists, including but not limited to maternal fetal medical specialists, neonatologists, radiologists/sonographers, anesthesiologists, infectious disease experts, cardiologists, pulmonologists, and neurologists.

### Newborn Resuscitation Departures

failure to prepare in a timely manner with appropriate personnel for resuscitation of the newborn; failure to establish an airway of the newborn; failure to supply oxygen to the newborn in a manner which would enable the newborn to exchange gases in an effective manner; failure to consider the administration of surfactant; failure to assess and correct

acid base balance; failure to order and assess cord blood gases; failure to do a C.B.C. of

the newborn; failure to assess electrolyte imbalance in the newborn; failure to supply

respiratory support in a timely manner and at a therapeutic level; failure to prevent

meconium aspiration of the newborn; failure to visualize the vocal cords; failure to

intubate and suction meconium aspiration from the lungs; and failure to make adequate

and proper consultations at timely and sufficient intervals with other doctors and

specialists, including but not limited to maternal fetal medical specialists, neonatologists,

radiologists/sonographers, anesthesiologists, infectious disease experts, cardiologists,

pulmonologists, and neurologists.

### Departures after Transfer to the Newborn Nursery

failure to monitor the blood gases of the newborn; failure to provide proper oxygen

therapy in the newborn nursery; failure to observe and appreciate the significance of the

infant's clinical signs and symptoms; failure to assess electrolyte balance and correct

imbalance; failure to do a full and complete neurological workup and assessment; failure

to do a full sepsis workup, including cultures and antimicrobial and antiviral therapies in

a prompt and timely manner; failure to diagnose neonatal neurological syndrome; failure

to promptly and appropriately treat to insure that injury to the newborn from infection is

eliminated or minimized; premature discharge of infant; failure to schedule for a first

pediatric visit within 48 hours after discharge; and failure to make adequate and proper

consultations at timely and sufficient intervals with other doctors and specialists,

including but not limited to maternal fetal medical specialists, neonatologists,

radiologists/sonographers, anesthesiologists, infectious disease experts, cardiologists,

pulmonologists, and neurologists.

**DEMAND No. 6:**    State the name of each and every person who provided treatment and care for the patient, ROGER STEVEN CARDENAS, and whose conduct is claimed to have contributed to the conditions complained of.

**RESPONSE No. 6:**   Plaintiffs object to this question as being overly broad and beyond the scope of Bill of Particulars.  It calls for expert opinions and evidentiary materials. Plaintiffs are not aware of any information responsive to this demand at this time. Furthermore, the names of each and every person who provided treatment and care for Plaintiffs are better known to Defendant.

**DEMAND No. 7:**    State the status or job of each such person.

**RESPONSE No. 7:**   Plaintiffs object to this question as being overly broad and beyond the scope of Bill of Particulars.  It calls for expert opinions and evidentiary materials. Furthermore, it is repetitious to the extent that this demand has been addressed elsewhere in the demands and responses to the Bill of Particulars.  Further, the statuses and jobs of each and every person who provided treatment and care for Plaintiffs are better known to Defendant.

**DEMAND No. 8:**    Set forth the facts constituting the alleged violation of accepted practice, custom or medical standard.

**RESPONSE No. 8:**   Plaintiffs object to this question as being overly broad and beyond the scope of Bill of Particulars.  It calls for expert opinions and evidentiary materials. Furthermore, it is repetitious to the extent that this demand has been addressed elsewhere in the demands and responses to the Bill of Particulars.  Notwithstanding Plaintiffs' objections noted above, Plaintiffs repeat and reallege all allegations of negligence set forth in this Bill of Particulars, and more specifically:  failure to properly use Pitocin; failure to perform a timely Cesarean section; and failure to recognize the signs of fetal distress.

**DEMAND No. 9:**    State whether or not any claim is made as to improper or defective equipment and, if so, describe such equipment.

**RESPONSE No. 9:**   Plaintiffs object to this question as being overly broad and beyond the scope of Bill of Particulars.  It calls for expert opinions and evidentiary materials. Furthermore, it is repetitious to the extent that this demand has been addressed elsewhere in the demands and responses to the Bill of Particulars.  Further, the use of improper or defective pieces of equipment or instruments made by Defendant is better known to Defendant.  Even further, Defendant also knows whether the equipment used was improper, defective, and/or negligently used.  Notwithstanding Plaintiffs' objections noted above, Plaintiffs repeat and reallege all allegations of negligence set forth in this Bill of Particulars, and more specifically, that Defendant used defective fetal monitor equipment and/or failed to use it properly.

**DEMAND No. 10:**    State facts constituting the alleged improper care claimed against this defendant.

**RESPONSE No. 10:**  Plaintiffs object to this question as being overly broad and beyond the scope of Bill of Particulars.  It calls for expert opinions and evidentiary materials. Furthermore, it is repetitious to the extent that this demand has been addressed elsewhere in the demands and responses to the Bill of Particulars.  Notwithstanding Plaintiffs' objections noted above, Plaintiffs repeat and reallege all allegations of negligence set forth in this Bill of Particulars, and more specifically:  failure to properly use Pitocin; failure to perform a timely Cesarean section; and failure to recognize the signs of fetal distress.

**DEMAND No. 11:**    Set forth all the acts on the part of the defendant hospital constituting the alleged failure in the supervision, care and treatment of the plaintiff.

**RESPONSE No. 11:** Plaintiffs object to this question as being overly broad and beyond the scope of Bill of Particulars. It calls for expert opinions and evidentiary materials. Furthermore, it is repetitious to the extent that this demand has been addressed elsewhere in the demands and responses to the Bill of Particulars. Notwithstanding Plaintiffs' objections noted above, Plaintiffs repeat and reallege all allegations of negligence set forth in this Bill of Particulars, and more specifically: failure to properly use Pitocin; failure to perform a timely Cesarean section; and failure to recognize the signs of fetal distress.

**DEMAND No. 12:** State the nature, extent, and location of each and every injury sustained by the plaintiff.

**RESPONSE No. 12:** Defendant's negligence and departures from standards of good and accepted medical practice and negligence as alleged herein were each and all an actual and proximate cause of the following permanent injuries to Infant Plaintiff: global developmental delays, motor difficulties, speech and language delays, dystonic posturing, hypotonia, basal ganglia infarct, right hand weakness, hip flexor muscle weakness, delays in physical milestones, respiratory distress syndrome, cerebral infarction, seizures, hemiparesis, subdural and cerebral hemorrhaging, convulsions, cerebral palsy, intrapartum inoxio/hypoxia, respiratory problems, and the need for bilateral ankle to foot orthotics.

**DEMAND No. 13:** State particularly each injury claimed to be permanent, and in what respect it is claimed to be permanent.

**RESPONSE No. 13:** All injuries are permanent.

**DEMAND No. 14:** State the usual vocation or occupation of the plaintiff, the amount of the daily, weekly or monthly wages or salary, and the length of time incapacitated from work, and the name and address of the employer.

RESPONSE No. 14:  Infant Plaintiff has never worked and due to injuries sustained as a

result of Defendant's negligence, will never be able to engage in meaningful

employment.  Infant Plaintiff claims future economic damages and future loss of earnings

as set out below:

     1)    <u>Damage from the Date of the Injury to Present</u>, including medical care and

equipment therefore, custodial care, extraordinary care.  These damages have not been

ascertained fully at this time as liens are not fully known and will not be known until the

time of trial.  Defendant may assume that these damages do not exceed $750,000.00;

however, Plaintiffs reserve the right to supplement this claim when the damages are more

fully known.

     2)    <u>Loss of Earning Ability.</u>  Infant Plaintiff has sustained damages by reason

of his loss of earnings ability as a result of Defendant's negligence.  Infant Plaintiff,

before injury, would have been capable of successfully pursuing and completing a full

four year college program and achieving a bachelor's degree.  As a result of the injury

caused by Defendant's negligence, Infant Plaintiff will earn less, which amounts are set

out below.  The jury will be asked to assess the full damages for loss of earnings based

upon these government statutes:

Minimum wage:    $14,872.00
Source: State of New York minimum wage of $7.15 per hour in 2007.

Earnings per year based on education in 2005 dollars:
<u>Male:</u>

| | |
|---|---|
| High School non graduate: | $23,764.00 |
| High School graduate: | $35,364.00 |
| 2-Year College: | $46,186.00 |
| 4-Year College: | $68,267.00 |

The source for the earnings based on education is the U.S. Bureau of Labor Statistics and Census Bureau publication: PINC-04. Educational Attainment – People 18 Years Old and Over, by Total Money Earnings in 2005.

2A)  Worklife Expectancy.

Male:

| | |
|---|---|
| High School Graduate: | 38.2 years |
| 2-Year College: | 38.5 years |
| 4-Year College: | 38.6 years |

The source for worklife expectancy is based on worklife expectancy article published in the Journal of Econometrics 2003.

2B)  Earnings growth rate.  3.3% per year.

The above annual earnings are based on today's average annual earnings. Infant Plaintiff will offer proof that these damages will increase 3.3% per year over Infant Plaintiff's work life.

The source for earnings growth rate is based on the 10 years average increase rate in wages and salaries: 2006 Economic Report of the President Table B-48.

3)  Future Medical, Therapies, and Assisted Living Costs (Future Economic Losses).  Infant Plaintiff will require and/or benefit from the following based on an injury to Infant Plaintiff caused by Defendant's negligence.  Said amounts are annual amounts based on today's costs and will increase by the growth rates set forth in 3A.

| Item of Future Need | Annual Cost Not to Exceed |
|---|---|
| Physical and Occupational Therapy | $ 50,000.00 |
| Medication and Medical Equipment | $ 25,000.00 |
| Home Care/Assistance Until Age 21 | $ 85,000.00 |
| Home Care/Assistance After Age 21 | $150,000.00 |
| Tutoring/Private Schooling Until Age 21 | $ 45,000.00 |

3A)   Inflation Rates. The following inflation rates (growth rates) on future

economic losses:

| | |
|---|---|
| Overall medical care: | 4% |
| Medication (Prescription): | 4.1% |
| Medication (Prescription & over-the-counter) | 3.0% |
| Professional Services (Physicians & Therapies) | 3.5% |
| Equipment: | 2.8% |
| Home Aide: | 3.3% |
| Home care by R.N.: | 3.5% |
| Group Home: | 4% - 4.4% |
| Tutoring: | 3.5% |
| Private schooling (through High School) | 6.4% |

The sources of the above projected inflation rates are the 10-year average inflation

rates in the medical care category of the consumer price index as published by the U.S.

Bureau of Labor Statistics in their CPI Detailed Report.

The equipment inflation rate is based on the projection by the Social Security

Administration for the future inflation (CPI) rate.

The home aide inflation rate is based on the general projected earnings growth rate.

DEMAND No. 15:   State the length of time that the plaintiff was confined to (a)
hospital; (b) bed; (c) home; as a consequence of the alleged occurrence.

RESPONSE No. 15: Infant Plaintiff is a permanently disabled child who requires

constant attention and care. It is not feasible at this time to characterize Infant Plaintiff's

confinement to hospital, bed, or home.

DEMAND No. 16:   State the amounts claimed as special damages for: (a) physician's
services and medical supplies; (b) hospital expenses; (c) nurses; services; (d) loss of
earnings; and (e) each and every other item of special damage incurred as a consequence
of the alleged occurrence.

RESPONSE No. 16: As to Infant Plaintiff, Infant Plaintiff's loss of earnings is covered

in RESPONSE No. 14. As to Adult Plaintiff, Adult Plaintiff has sustained damages by

reason of her loss of earnings ability as a result of Defendant's negligence. Adult

Plaintiff, before injury, would have been capable of successfully pursuing and maintaining a career. As a result of Defendant's negligence, Adult Plaintiff has provided nursing services for Infant Plaintiff and is entitled to recover the cost of the nursing services, which Plaintiffs claim is $45,000 per year. At all relevant times, Plaintiffs were insured by Medicaid.

Plaintiffs reserve the right to supplement any and all responses at the completion of discovery.

Dated:     Yonkers, NY
           January 25, 2007

                           Fitzgerald & Fitzgerald, P.C.
                           By: John E. Fitzgerald, Esq.
                           Attorneys for Plaintiffs
                           538 Riverdale Avenue
                           Yonkers, NY 10705
                           Tel: (914) 378-1010
                           Fax: (914) 378-1092
                           File No.: A05124

To:
     O'Connor, McGuinness, Conte, Doyle & Oleson
     Attorneys for defendant,
     Phelps Memorial Hospital Center
     1 Barker Avenue – Suite 675
     White Plains, NY 10601
     Tel: (914) 948-4500
     Fax: (914) 948-0645
     File No.:

## INDIVIDUAL VERIFICATION

STATE OF NEW YORK           )
                            )   ss.:
COUNTY OF WESTCHESTER )

The undersigned being duly sworn, deposes and says:

Deponent is the plaintiff in the within action; deponent has read the foregoing Plaintiff's Bill of Particulars and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters, deponent believes it to be true.

*Eudocia Anguisaca*
EUDOCIA ANGUISACA

Sworn to before me this

25th day of January, 2007

NOTARY PUBLIC

MERCEDES BUINA
Commissioner of Deeds
City of Yonkers
Certificate Filed in Westchester County
Commission Expires 12/31/08

# Exhibit F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

ROGER STEVEN CARDENAS, an infant, by his Mother :
and Natural Guardian, EUDOCIA ANGUISACA, and
EUDOCIA ANGUISACA, individually,                   :

                                                    :  <ins>ECF CASE</ins>

     Plaintiffs,                                      :

        against -                                   :

                                                 :  07 Civ. 11145 (KMK)(GAY)

PHELPS MEMORIAL HOSPITAL CENTER, OPEN       :
DOOR FAMILY MEDICAL CENTER, INC. and
OSSINING OPEN DOOR                          :

     Defendants.                                      :

------------------------------------------------------------------ x

PHELPS MEMORIAL HOSPITAL CENTER,            :

     Third-Party Plaintiff,                           :

        against -                                   :

OPEN DOOR FAMILY MEDICAL CENTER, INC. and   :
OSSINING OPEN DOOR,                         :

     Third-Party Defendants.                          :

------------------------------------------------------------------ x

<div align="center">

DECLARATION OF
<ins>RICHARD G. BERGERON</ins>

</div>

1. I am a Senior Attorney in the General Law Division, Office of the General Counsel, Department of Health and Human Services (the "Department"). I am familiar with the official records of administrative tort claims maintained by the Department as well as with the system by which those records are maintained.

2. The Department's Claims Branch maintains a computerized database record of administrative tort claims filed with the Department, including those filed with respect to federally supported health centers that have been deemed to be eligible for Federal Tort Claims Act malpractice coverage.

- 2 -

3. As a consequence, if a tort claim had been filed with the Department with respect to Open Door Family Medical Center, Inc.,[1] a record of that filing would be maintained in the Claims Branch's database.

4. I caused a search of the Claims Branch's database to be conducted and found no record of an administrative tort claim filed by Eudocia Anguisaca, either individually or on behalf of Roger Steven Cardenas, relating to Open Door Family Medical Center, Inc., or Patricia Mahoney, C.N.M.

5. I have also reviewed official agency records and determined that Open Door Family Medical Center, Inc., was first deemed eligible for Federal Tort Claims Act malpractice coverage effective July 1, 1994, and that its deemed status has continued without interruption since that date. Copies of the notifications by an Assistant Surgeon General, Department of Health and Human Services, to Open Door Family Medical Center, Inc., are attached to this declaration as Exhibit 1.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Dated at Washington, D.C., this 20th day of February, 2008.

RICHARD G. BERGERON
Senior Attorney, Claims and Employment Law Branch
General Law Division
Office of the General Counsel
Department of Health and Human Services

---

[1] Ossing Open Door is a delivery site operated by Open Door Family Medical Center, Inc.

# Exhibit G

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: LI YU
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel: (212) 637-2734
Fax: (212) 637-2686

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

ROGER STEVEN CARDENAS, an infant, by his Mother       :
and Natural Guardian, EUDOCIA ANGUISACA, and          :
EUDOCIA ANGUISACA, individually,                      :
                                                      :
                    Plaintiffs,                       :
                                                      :
              - against -                             :        **CERTIFICATION**
                                                      :
                                                      :        07 Civ. _____
PHELPS MEMORIAL HOSPITAL CENTER,                      :
                                                      :
                    Defendant.                        :
                                                      :
-------------------------------------------------------------------- x

PHELPS MEMORIAL HOSPITAL CENTER,                      :
                                                      :
              Third-Party Plaintiff,                  :
                                                      :
              - against -                             :
                                                      :
OPEN DOOR FAMILY MEDICAL CENTER, INC. and             :
OSSINING OPEN DOOR,                                   :
                                                      :
              Third-Party Defendants.                 :
                                                      :
-------------------------------------------------------------------- X

I, Michael J. Garcia, the United States Attorney for the Southern District of New York,

pursuant to the provisions of section 224 of the Public Health Service Act, 42 U.S.C. § 233, and

28 U.S.C. § 2679(d), and by virtue of the authority vested in me by the Attorney General under

28 C.F.R. § 15.4(b), hereby certify, on the information presently available, that, at all times

relevant to this civil action, third-party defendant Open Door Family Medical Center, Inc.

(including its office in Ossining, New York – third-party defendant Ossining Open Door) and its

employees were acting within the scope of their employment when they rendered pre-natal care

to plaintiff Eudocia Anguisaca and care during the delivery of plaintiff Roger S. Cardenas and

that, pursuant to section 224(g) of the Public Health Service Act, 42 U.S.C. § 233(g), third-party

defendants Open Door Family Medical Center, Inc. and Ossining Open Door are deemed to be

employees of the United States under the Federal Tort Claims Act.

Dated: New York, New York
       December 7, 2007

By: _____
    MICHAEL J. GARCIA
    United States Attorney
    Southern District of New York

2